In the
United States Court of Appeals
For the Seventh Circuit

No. 99-1414

United States of America,

Plaintiff-Appellee,

v.

James E. Johnson,

Defendant-Appellant.


Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 97 CR 211--Charles N. Clevert, Judge.


Argued September 10, 1999--Decided January 13, 2000


   Before Flaum, Manion, and Diane P. Wood, Circuit
Judges.

   Manion, Circuit Judge.   James Johnson was
convicted by a jury of one count of conspiracy to
distribute and to possess with intent to
distribute in excess of five kilograms of
cocaine. He was sentenced to 360 months of
imprisonment. He argues on appeal that the
government failed to provide Jencks Act material
and that the district court erred in admitting
hearsay at his trial. As to his sentence, Johnson
argues that the district court erred in adopting
the government's determination of the amount of
cocaine attributable to him. Finding no error, we
affirm.

I.

   The prosecution's primary witness at Johnson's
trial was Michael Blake, one of Johnson's
associates and drug suppliers who had agreed to
cooperate with the authorities. Blake testified
that he began distributing cocaine in the
Milwaukee, Wisconsin area around 1979. He met
Johnson around that time through Johnson's
brother, Charles, and began distributing drugs to
James Johnson. Blake's drug distribution was
periodically interrupted by short stints in
prison, but when he was released in 1995, a
former prison buddy--Candelario Nevarez-Diaz--
contacted him and proposed a cocaine dealing

venture. Nevarez-Diaz agreed to front the cocaine, meaning Blake would pay for it only after he had sold it to others. That very night, Nevarez-Diaz fronted Blake 125 grams of cocaine, which Blake in turn fronted to Johnson and another individual, Gordon Hagenkord. Blake and Hagenkord also fronted cocaine to Robert Schultz/1 and his stepdaughter Colleen Hanson, who sold it out of Shultz's Milwaukee bar, the Blue Ribbon Pub.

The sales continued and increased to a point where in early 1996, Nevarez-Diaz was supplying Blake with one kilogram of cocaine every two months. Blake, in turn, delivered some of the cocaine to Johnson's home in Milwaukee. Blake testified that in 1996, he delivered up to two kilograms of cocaine to Johnson at any one time, and Johnson paid him $28,000 for each kilogram. By this time, Blake was working closely with Nevarez-Diaz and even used Nevarez-Diaz's money to purchase a Chevrolet Lumina to transport drugs from Arizona. In 1997, Nevarez-Diaz supplied Blake with around 5 to 10 kilograms of cocaine every ten to twelve days, for which Blake paid him $22,000 per kilogram. Blake, in turn, supplied Johnson with between 3 and 4 kilograms of cocaine every ten to twelve days, and sold it on credit for about $27,000 per kilogram. Blake estimated that between January 1, 1996 and July 24, 1997 he supplied Johnson with between 35 and 45 kilograms of cocaine.

On July 24, 1997, the police finally caught up with Blake when they pulled his car over for a traffic violation. A search of his vehicle turned up cocaine and around $120,000, some of which Johnson had given to Blake for cocaine. Charged with possession of cocaine and facing a long stretch in prison, Blake decided to cooperate with the government. With the assistance of the police, he placed recorded telephone calls to Nevarez-Diaz, Johnson, and Hagenkord. Audio tapes of Blake's four conversations with Johnson were admitted into evidence and played for the jury. The recorded conversations were consistent with Blake's testimony that he fronted cocaine to Johnson and that Johnson was a willing participant in the conspiracy.

Johnson testified at his trial, and although he admitted that he used cocaine, he denied that he ever was involved in a drug conspiracy. Rather, Johnson stated that he and Blake sold seafood products. According to Johnson, Blake would drop off shrimp, which Johnson would peddle on the street and for which he would pay Blake some of the proceeds. Apparently the jury did not believe him, as it convicted him of one count of conspiracy with intent to distribute and

possession with the intent to distribute cocaine, in violation of 21 U.S.C. sec. 841(a)(1). With an offense level of 37 and a criminal history category of VI, Johnson was sentenced to 360 months of imprisonment, the shortest sentence permitted under the Guidelines.

II.

A.  Co-Conspirator Exception to the Hearsay Rule

During direct examination, government witness Gordon Hagenkord was asked about his duties in carrying on the drug business after supplier Michael Blake was arrested. As part of his response Hagenkord stated that when he started selling drugs for Blake, "I took over the south side and J.J. [Johnson] had the north side." Johnson first contends that the district court erred in admitting this testimony. Johnson argues that this statement, "J.J. had the north side", was inadmissible hearsay not covered by the co-conspirator exception because Blake's statement was not made in furtherance of the conspiracy./2

We review for an abuse of discretion the district court's decision to admit testimony while its factual findings are examined for clear error. United States v. Mojica, 185 F.3d 780, 788 (7th Cir. 1999); United States v. Petty, 132 F.3d 373, 379 (7th Cir. 1997). A statement is not considered to be hearsay if it is made by "a co-conspirator of a party during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). To utilize the co-conspirator exception the government must show that: (1) a conspiracy existed; (2) the declarant and the defendant were both members of the conspiracy; and (3) the statements were made in the course and in furtherance of the conspiracy. Mojica, 185 F.3d at 788.

Statements which further the conspiracy must be distinguished from mere idle chatter, narrative declarations, and superfluous casual remarks which do not further the conspiracy. United States v. Curry, 187 F.3d 762, 766 (7th Cir. 1999); United States v. Santos, 20 F.3d 280, 286 (7th Cir. 1994) (narrative discussions of past events were not statements made in furtherance of the conspiracy). Statements made in furtherance of a conspiracy can take a variety of forms. Some examples include comments designed to assist in recruiting potential members, to inform other members about the progress of the conspiracy, to control damage to or detection of the conspiracy, to hide the criminal objectives of the conspiracy, or to instill confidence and prevent the desertion of other members. United States v. Godinez, 110 F.3d 448, 454 (7th Cir. 1997);

United States v. Stephenson, 53 F.3d 836, 845 (7th Cir. 1995); United States v. Brookins, 52 F.3d 615, 623 (7th Cir. 1995); United States v. Cox, 923 F.2d 519, 527 (7th Cir. 1991). Courts assess a statement's ability to advance the conspiracy in the context in which the statement was made. United States v. Powers, 75 F.3d 335, 340 (7th Cir. 1996). "The statement need not have been made exclusively, or even primarily, to further the conspiracy." Id. Rather, the record need only contain some reasonable basis for concluding that the statement in question furthered the conspiracy in some respect. Stephenson, 53 F.3d at 845; United States v. Marin, 7 F.3d 679, 690 (7th Cir. 1993).

Here, Blake's statement, "J.J. had the north side", as repeated by Hagenkord, served several purposes. First the statement gave Hagenkord confidence in the confederacy through knowledge that others like Johnson were similarly willing to participate in the conspiracy. More importantly, the statement conveyed to Hagenkord the breadth of the conspiracy, its geographical divisions, and his role with respect to those divisions. Blake's statement could have furthered the conspiracy by letting Hagenkord know that he was to concentrate on the south side of town while leaving the north side for Johnson. By precluding internecine competition, the conspiracy could more efficiently allocate its resources and thereby minimize waste. Thus, we have held that the "in furtherance" element is satisfied when the statement conveys information which helps conspirators perform their designated roles, as Blake's comment did in this case. Godinez, 110 F.3d at 454. Similarly, by preventing the conspiracy from becoming a house divided against itself, Blake's comment helped to prolong the conspiracy. Because Blake's statement to Hagenkord furthered the goals of the conspiracy in several respects, the district court did not err in admitting this testimony under Rule 801(d)(2)(E).

## B. Jencks Act

Johnson also argues that the government failed to provide Jencks Act material, despite the government's assurances to the district judge that it had no such material with respect to Gordon Hagenkord. In support of this argument, Johnson directs our attention to his trial attorney's cross-examination of Hagenkord.

Defense Counsel:

You said that persons [a prosecuting attorney, an IRS agent, and DEA agent Rodel Babasa] read reports to you?

Hagenkord:

They weren't reports. They were, they read back my own statements to me as I, they were putting them down.

Defense Counsel:

That is, they had a document that had your statement in it?

Hagenkord:

Yes.

Defense Counsel:

And they read your statements back to you?

Hagenkord:

Yes.

Defense Counsel:

And they read your statements back and asked you if that's what happened. Do I have that right?

Hagenkord:
Yes.

[Tr. Trans. Vol X pp. 348-49] According to Johnson, this colloquy demonstrates that Jencks material existed, and he argues that he never received this material.

The Jencks Act was enacted in response to the Supreme Court's holding in Jencks v. United States, 353 U.S. 657 (1957). To ensure the meaningful confrontation of government witnesses, the Act requires the government, upon the defendant's motion, to produce statements made by any of its witnesses which the particular witnesses signed, adopted, or approved, and which pertain to their testimony at trial. 18 U.S.C. sec. 3500(b); see also Fed. R. Crim. P. 26.2; United States v. Lopez, 6 F.3d 1281, 1288 (7th Cir. 1993). The hope is that these statements will afford the defense a basis for effective cross-examination of government witnesses and the possible impeachment of their testimony without overly burdening the government with a duty to disclose all of its investigative material. See United States v. O'Malley, 796 F.2d 891, 900 (7th Cir. 1986); United States v. Snow, 537 F.2d 1166, 1168 (4th Cir. 1976). To ensure the government's compliance with the Act the statute prescribes penalties for failing to produce Jencks material, which include the striking of the particular

witness's testimony or the declaration of a mistrial. 18 U.S.C. sec. 3500(d).

In addressing Johnson's argument that the Jencks Act was violated, the government presents a host of rather weak arguments. First, the government argues that Johnson only requested the prosecutor's notes, and made no general call for Jencks material. The trial transcript, however, indicates that the prosecutor's notes were merely one type of material sought by Johnson. Furthermore, even if Johnson's request could be construed as being limited to the prosecutor's notes, where (as in this case) the defendant sought at least some Jencks material and the AUSA affirmatively represented to the defendant and the district judge that no additional Jencks material existed, the defendant is entitled to rely on this representation. See United States v. Knapp, 25 F.3d 451, 460 (7th Cir. 1994) (a defendant need not move for each witness's Jencks material where the government promises to produce it).

The government then contends that Johnson's request for the material was not sufficiently specific. This argument fails because Johnson requested all Jencks material, and he could hardly identify documents by name when they are not in his possession. For this reason, we have said that a "defendant need not be extremely particular in requesting such information. A defendant's counsel cannot be overly specific about items he may never have seen." United States v. Allen, 798 F.2d 985, 997 (7th Cir. 1986).

The government then argues that Hagenkord did not approve or adopt any statements, thereby taking them outside the scope of the Act. The key question here is "'whether the statement can fairly be deemed to reflect fully and without distortion the witness's own words.'" United States v. Blas, 947 F.2d 1320, 1326 (7th Cir. 1991) (quoting Allen, 798 F.2d at 994). Hagenkord's testimony indicates that the government read his statements back to him and that he then assented to them. Under longstanding precedent this constitutes the witness's approval of them. Allen, 798 F.2d at 994 (adoption or approval can be shown by demonstrating that the interviewer read back to the witness what he wrote and the witness affirmatively stated his approval); see United States v. Marrero-Ortiz, 160 F.3d 768, 776 (1st Cir. 1998); United States v. Roseboro, 87 F.3d 642, 645 (4th Cir. 1996); United States v. Ogbuehi, 18 F.3d 807, 810-11 (9th Cir. 1994); United States v. Newman, 849 F.2d 156, 160 (5th Cir. 1988). So since this is precisely the process Hagenkord described, the government's argument gets nowhere.

Next, the government seems to argue that the purported statements at issue here were not covered by the Jencks Act because the AUSA in charge of the case was not the prosecuting attorney who read the statements back to Hagenkord and that he had no such document in his immediate possession. But as our colleagues on the Fifth Circuit have made clear, "[t]he Jencks Act is not restricted to statements 'in the hands of, or known to, the particular prosecuting attorney assigned to the case, the U.S. Attorney's office, the Criminal Section of the Justice Department, or even the entire Justice Department. Its order is unqualified.'" United States v. Ramirez, 174 F.3d 584, 588 (5th Cir. 1999); United States v. Bryant, 439 F.2d 642, 650 (D.C. Cir. 1971) (the duty to disclose under the Jencks Act "affects not only the prosecutor, but the Government as a whole, including its investigative agencies."). Thus, the document in question was required to be turned over to Johnson so long as any federal prosecuting attorney or agent had possession of it.

Finally, the government contends that Johnson has failed to show prejudice. On the surface, this argument has some legitimacy because although the text of the Act does not itself require a demonstration of prejudice, courts have held that relief may not be granted under the Jencks Act without such a showing. United States v. Riley, 189 F.3d 802, 806 (9th Cir. 1999) ("While a defendant need not prove prejudice to show a violation of the Jencks Act . . . when there is no prejudice, a witness's testimony need not be stricken."); United States v. Rosario-Peralta, 175 F.3d 48, 53 (1st Cir. 1999) (statements must be produced under the Jencks Act whether they are exculpatory or not, but no relief will be granted unless the failure to disclose caused prejudice). Furthermore, a showing of prejudice is part of the harmless error analysis, which also applies to Jencks violations. United States v. Wables, 731 F.2d 440, 448 (7th Cir. 1984) (a failure to produce Jencks material may be a harmless error "only when it is 'perfectly clear' that the nondisclosure of Jencks Act statements did not prejudice the defendant")./3 But in making this argument here, where the government allegedly did not produce the purported Jencks documents for the defendant to review, the argument's limitations become readily apparent. A defendant who does not know what is contained in unproduced Jencks documents would be hard pressed to show how that material would have benefitted his defense. So assuming that Johnson was never given the document in question, we can hardly hold Johnson responsible for his failure to allege

prejudice. Indeed, it would be improper for counsel who are ignorant of a document's contents to argue that the failure to produce such a document prejudiced the defense.

Ultimately, however, Johnson cannot prevail on this argument because he neither raised it nor attempted to develop it before the district court. Although there is no question that he initially requested Jencks documents, Johnson never pursued this request after he learned at trial about the alleged statements read back to Hagenkord. Johnson should have informed the district court about the potential contradiction created by Hagenkord's testimony and the AUSA's assertion that no Jencks material existed. Similarly, as Agent Babasa was identified by Hagenkord as being present while Hagenkord approved the statements, Johnson's attorney should have cross-examined Babasa about the document and the meeting. Had Johnson done this, and his efforts demonstrated the existence of a probable Jencks document that had not been produced, the district judge would have been obliged to conduct a hearing on the matter, thereby preserving the issue for appellate review. Lopez, 6 F.3d at 1288-89. Alternatively, if the district judge denied the defendant's motion to hold such a hearing, that decision itself would be subject to appellate scrutiny. Id. at 1289. But because Johnson failed to take any of these steps, he has waived this argument, and we review only for plain error. United States v. Shorty, 159 F.3d 312, 313 (7th Cir. 1998).

In an effort to get to the bottom of this, at oral argument we asked AUSA Paul Kanter (who was also the trial prosecutor) whether he knew to which document Hagenkord was referring, and whether the document was produced for Johnson. Kanter unequivocally insisted that any such document would have been turned over to Johnson under the open file discovery policy of the United States Attorney's office and that he had no knowledge of any such government document that was not given to Johnson. In light of these assertions, if the document in question existed, it was available to Johnson. This would certainly explain why Johnson's trial counsel declined to further explore this issue with Hagenkord and Babasa on cross-examination, and why he didn't present this argument to the district court or seek a hearing on the matter. In short, Johnson points to nothing in the record which indicates that he did not receive this document, but instead asks us to speculate that this may be the case. Because the open file policy gives defense counsel access to all information available to the prosecution and there is nothing in the record which definitively indicates that a Jencks

document was not produced for the defense, we cannot say that there was an error here, much less a manifest error that affected Johnson's rights. See United States v. Cusimano, 148 F.3d 824, 828 (7th Cir. 1998)./4 Accordingly, Johnson cannot prevail on this argument.

## C. Calculation of Drug Amounts for Sentencing

Finally, Johnson attacks the district court's decision that, for purposes of determining his relevant conduct for sentencing, Johnson should be held responsible for between 15 and 50 kilograms of cocaine. This resulted in a base offense level of 34. See U.S.S.G. sec. 2D1.1(c)(3). Johnson complains that the district court adopted the Probation Department's calculation of the drug quantity, which Johnson asserts was just a wholesale adoption of the government's position on the matter./5 Thus, he seems to question the integrity of the calculations.

We review the district court's calculations of drug quantities for clear error. United States v. Span, 170 F.3d 798, 803 (7th Cir. 1999). We must affirm unless we are left with the firm conviction that a mistake has been committed. Id. The defendant has the right to be sentenced on the basis of a reasonable quantity of reliable information. United States v. James, 113 F.3d 721, 730 (7th Cir. 1997). The government has the burden of establishing the type and amount of drugs attributable to the defendant by a preponderance of the evidence. Id. Thus, clear error can occur with respect to drug calculations when the government fails to marshal evidence of a sufficient magnitude or where the calculations are based on unreliable evidence. Span, 170 F.3d at 803. In calculating the drug quantities, a district court may "consider a wide range of information so long as it has a "'sufficient indicia of reliability to support its probable accuracy.'" United States v. Robinson, 164 F.3d 1068, 1070 (7th Cir. 1999) (quoting United States v. Taylor, 72 F.3d 533, 543 (7th Cir. 1995)). In assessing the reliability of the evidence we will leave credibility determinations to the sound discretion of the district court. United States v. Miner, 127 F.3d 610, 615 (7th Cir. 1997).

Here, the district judge stated his reasons for calculating the drug quantity as he did, and the evidence he relied upon in making the calculation.

Well, I have listened carefully to your arguments and have had a chance to look at some of the transcript which is available. Among the

things that I note from my review of the record set forth in the transcript and my notes as well as my recollection of the witnesses as they testified is that there were some places where there were inconsistencies in the testimony of Mr. Blake and Mr. Hagenkord and Mr. Babasa.

But notwithstanding that Blake and Hagenkord in my view were truthful, truthful in the relevant aspects insofar as drug quantities are concerned. I note that their testimony was corroborated in large measure by the tape, the conversations of Mr. Johnson. This conspiracy lasted at least 21 months. And as Mr. Kanter has pointed out, if at least one kilogram was delivered each month then Mr. Johnson was responsible for at least 21 kilos and the quantity of drugs for which he can be held responsible is clearly within the 15 and 50 kilograms which would obviously affect the implications of the guidelines.

[Sent. Tr. Vol. 16 p.14-15]

It is clear from this excerpt that the district judge based his calculations on the evidence in the record, and that he did not simply restate the government's calculations set forth in the pre-sentence report without first scrutinizing them. Rather, he determined that the government's calculations were correct, and in fact were quite conservative. (Recall Blake's testimony that he supplied Johnson with between 35 and 45 kilograms of cocaine.) Johnson correctly notes that there could be some problem if the district judge unwittingly relied on the recommended calculations of the pre-sentence report thinking that they were non-partisan conclusions, or if he failed to scrutinize them in any way. But "district judges have the ability to read a pre-sentence report without being improperly influenced." United States v. Sifuentez, 30 F.3d 1047, 1049 (9th Cir. 1994) (emphasis in original). In this case, not only was the district judge made aware of the government's authorship of the calculations, he based his adoption of these figures on an independent review of the record.

Importantly, the Probation Department's substantial reliance on the government's position does not mean that the information on which it relied or the calculations that it performed were inaccurate; it simply means that the Probation Department also believed that there was a sufficient basis for these calculations. Notably, Johnson fails to show that there was insufficient evidence to support the district court's calculations, or that the evidence on which the calculations were based is unworthy of credence; rather, his sole complaint is with the PSR's

conformity with the government's view. Because Johnson fails to show that the district court's determinations were incorrect or that they were based on unreliable evidence, we conclude that the district court did not clearly err in finding that Johnson should be held responsible for between 15 and 50 kilograms of cocaine.

For all of these reasons, we affirm.

/1 Both Hagenkord and Shultz pleaded guilty to one count of conspiracy to distribute and possess with intent to distribute in excess of five kilograms of cocaine, in violation of 21 U.S.C. sec.sec. 841(a)(1) & 846.

/2 Although at first glance this statement may not appear to be hearsay, the parties agree that Hagenkord was paraphrasing Blake, and that the statement was indeed hearsay.

/3 However, in at least one federal circuit, deliberate misrepresentations to the district court that no Jencks material exists precludes harmless error analysis. United States v. DeFranco, 30 F.3d 664, 667 (6th Cir. 1994).

/4 The present case is much like the one we faced in United States v. Starnes, 644 F.2d 673, 680 (7th Cir. 1981). There, we held that the defendants forfeited their argument that the prosecutor failed to provide Brady material where the prosecutor denied having such material and the defendant failed to explore the issue by cross-examining government agents or seeking a hearing.

/5 The record supports Johnson's contention that the Probation Department relied on the government's calculations of drug quantities, as Kanter specifically stated so during the sentencing hearing. Johnson argued before the district court (but not to this court) that the only reliable evidence showed that he was responsible for 4.5 kilograms of cocaine, thereby giving him a base offense level of 30.