In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 15-2584

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MATTHEW ELDER,

*Defendant-Appellant.*

---

Appeal from the United States District Court for the
Southern District of Indiana, Evansville Division.
No. 13-cr-00017 — **Richard L. Young**, *Chief Judge.*

---

ARGUED SEPTEMBER 9, 2016 — DECIDED OCTOBER 25, 2016

---

Before POSNER, MANION, and WILLIAMS, *Circuit Judges.*

MANION, *Circuit Judge.* Matthew Elder was convicted for conspiracy to distribute methamphetamine and sentenced to a mandatory term of life imprisonment. He now appeals his conviction and sentence. For the reasons that follow, we affirm Elder's conviction but vacate his sentence and remand for resentencing.

I. BACKGROUND

## A. Trial and Conviction

In 2013 Matthew Elder ("Elder") and seven codefendants, including his father Bill Elder ("Bill"), were charged in a superseding indictment with conspiring to traffic large quantities of methamphetamine from Arizona to southwest Indiana. Elder and Bill pleaded not guilty and went to trial, while the remaining codefendants all pleaded guilty.

At trial, Elder's coconspirators testified in detail about his involvement in the conspiracy. Perhaps the most important testimony came from coconspirator Michael Curinga, who first met Elder in Arizona in the summer of 2012. Curinga began supplying Elder with methamphetamine for personal use, though it wasn't long before Elder expressed an interest in buying "large quantities" of methamphetamine to transport to Indiana.[1] To that end, Elder introduced Curinga to Bill around October 2012, and the three met at a restaurant a few days later to exchange drugs. The deal went off without a hitch. Elder gave Curinga a cooler with money inside. Curinga took the cooler to his supplier, replaced the money with methamphetamine, then returned to the restaurant and gave the cooler back to Bill and Elder. Curinga charged Bill and Elder $33,000 for the drugs.

Elder and Curinga continued to deal on very similar terms over the next several months. Each time, Elder gave Curinga a cooler packed with money; Curinga brought the cooler to his supplier, replaced the money with several pounds of

---

[1] Curinga initially testified that Elder asked him for 3.5 ounces of methamphetamine, but he later clarified that the two exchanged numerous pounds of methamphetamine during the conspiracy.

methamphetamine, and then returned the cooler to Elder. On one occasion in December 2012, Curinga noticed that Elder's payment for the drugs came up short. Elder insisted that the money was all there, and Curinga eventually decided to "eat the difference" because the deal was still profitable. But Curinga was not the only one concerned about Elder's malfeasance; a few months later, Bill called Curinga and complained that Elder was "getting his hands in the money" and was bad for business. As a result, Bill and Curinga agreed to cut Elder out of the next delivery, which took place in February 2013.

The jury also heard from a coconspirator named Michael Clark, who testified that he purchased methamphetamine from Bill and Elder at a Phoenix hotel in December 2012. Clark arrived at the hotel with a bag of money, Bill and Elder counted the money, and Elder left with the money and returned a few hours later with methamphetamine. (Clark explained that he knew the substance brought by Elder was methamphetamine because he had been using that drug for the past twenty years and so was very familiar with it, and because the substance produced the same effect as methamphetamine when he tried it.) Bill and Elder then distributed the methamphetamine among the three of them, and Clark transported his share of the drugs back to Indiana as usual.

Further evidence against Elder came from coconspirators Lauri Cupp and Terry Ward, who were dating and lived together at Ward's house in Indiana during the conspiracy. Ward used to travel to Phoenix with Bill to buy methamphetamine and then bring it back to Ward's house for further distribution among the conspirators. A portion of the drugs would go to Cupp, who used some for herself and sold the

rest to her customers. On one particular drug run in December 2012, Bill and Ward took longer than usual. Cupp testified that when they returned, she heard them angrily complaining that their trip was delayed because Elder gave them only part of the methamphetamine that he owed them. Defense counsel objected to Cupp's testimony as hearsay, but the court admitted the testimony under the coconspirator exclusion to the hearsay rule. *See* Fed. R. Evid. 801(d)(2)(E).

Following trial, the jury found Elder guilty of conspiring to distribute 50 grams or more of methamphetamine and 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841 and 846.

**B. Sentencing**

Before sentencing, the government filed an information under 21 U.S.C. § 851 indicating that Elder had two prior Arizona drug convictions: a 1999 conviction for possession of equipment or chemicals for the manufacture of dangerous drugs, and a 1997 conviction for possession of drug paraphernalia. The government argued that Elder's two prior convictions were "felony drug offenses" under 21 U.S.C. § 841(b)(1)(A), which requires a defendant to be sentenced to life if he is convicted of a serious drug offense after having previously been convicted of two or more drug-related felonies. The district court reluctantly agreed, explaining that it believed a life sentence was overly harsh and unjust, but that it had no discretion to issue a lesser sentence under the statute. Based on its finding that Elder's prior convictions qualified as felony drug offenses, the court sentenced Elder to a mandatory term of life imprisonment in July 2015.

## II. DISCUSSION

Elder raises three arguments on appeal. First, he argues that the district court erred by allowing Cupp to testify about the conversation she overheard concerning his involvement in the conspiracy. Second, he argues that the jury's verdict must be overturned because it is not supported by sufficient evidence. Third, he argues that the district court erroneously imposed a mandatory term of life imprisonment. We address each argument in turn.

### A. Statements of Coconspirators

Elder challenges the district court's decision to admit Cupp's testimony about the conversation she overheard between Bill and Ward when they returned from Arizona in December 2012. In particular, he contends that the coconspirator exclusion does not apply because the conversation was not "in furtherance of the conspiracy." *See* Fed. R. Evid. 801(d)(2)(E). We review the district court's ruling for an abuse of discretion and its underlying factual findings for clear error. *United States v. Johnson*, 200 F.3d 529, 532 (7th Cir. 2000).

Federal Rule of Evidence 801 provides that a statement offered against a party is not hearsay if the statement was "made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). Statements can further the conspiracy in a number of ways. "Some examples include comments designed to assist in recruiting potential members, to inform other members about the progress of the conspiracy, to control damage to or detection of the conspiracy, to hide the criminal objectives of the conspiracy, or to instill confidence and prevent the desertion of other members."

*Johnson*, 200 F.3d at 533. A coconspirator's statement may satisfy the "in furtherance" requirement even if the statement was not "exclusively, or even primarily, made to further the conspiracy." *United States v. Cruz-Rea*, 626 F.3d 929, 937 (7th Cir. 2010) (internal marks omitted).

We see no error in the district court's conclusion that the challenged statements in this case were made in furtherance of the conspiracy. Cupp testified that she heard Bill and Ward saying that Elder did not give them the agreed-upon amount of drugs to be distributed in Indiana as planned. Bill and Ward's statements directly related to the conspiracy's progress and were clearly part of the ordinary "information flow" among conspirators designed to "help each perform his role." *See United States v. Alviar*, 573 F.3d 526, 545 (7th Cir. 2009) (internal marks omitted). The statements also worked to undermine confidence in Elder as a reliable drug source, and they alerted Cupp to a deficiency in her supply chain (recall that Ward got the drugs from Elder, while Cupp got her drugs from Ward) that resulted in an appreciable delay in business as well as an unanticipated reduction in supply. Far from mere "narrative declarations" of past events, *Johnson*, 200 F.3d at 533, the statements also betokened the conspiracy's impending reorganization: shortly after complaining about Elder's misconduct, Bill called Curinga to exclude Elder from future transactions because he was bad for business.

In sum, the challenged statements were made between two conspirators, in the presence of a third conspirator, about a problem that arose during a recent conspiratorial transaction with a fourth conspirator, and that appears to have prompted a decisive remedial change in the conspiracy's structure. Under these circumstances, there was plainly a

"'reasonable basis'" to conclude that the statements furthered the conspiracy. *See Cruz-Rea*, 626 F.3d at 937. Accordingly, the district court did not abuse its discretion in admitting Cupp's testimony under Rule 801(d)(2)(E).

**B. Sufficiency of the Evidence**

Elder next contends that the government presented insufficient evidence to convict him of conspiracy. In considering the sufficiency of the evidence, "[w]e view the evidence in the light most favorable to the government and will overturn a conviction only if the record contains no evidence from which a reasonable juror could have found the defendant guilty." *United States v. Longstreet*, 567 F.3d 911, 918 (7th Cir. 2009); *see also United States v. Jones*, 222 F.3d 349, 352 (7th Cir. 2000) ("[A]s long as *any* rational jury could have returned a guilty verdict, the verdict must stand."). When challenging a conviction for insufficiency of the evidence, the defendant bears a "heavy" burden that is "'nearly insurmountable.'" *United States v. Moses*, 513 F.3d 727, 733 (7th Cir. 2008).

To prove a conspiracy charge, "the government must show both that a conspiracy existed and that the defendant knowingly agreed to join it." *United States v. Pagan*, 196 F.3d 884, 889 (7th Cir. 1999). The essence of a conspiracy is "an agreement to commit an unlawful act." *United States v. Baker*, 40 F.3d 154, 160 (7th Cir. 1994) (internal marks omitted).

Here, the government introduced ample evidence establishing that Elder knowingly agreed with others to unlawfully distribute methamphetamine as charged in the superseding indictment. Curinga testified that he and Elder negotiated several high-volume deals to further the drug ring's operations in Indiana, and that Elder successfully introduced him

to Bill to expand the drug ring and increase supply. Additional testimony showed that, around December 2012, Elder supplied methamphetamine to coconspirators Clark, Bill, and Ward, who then delivered the drugs to Indiana according to plan. Viewed in the light most favorable to the government, the uncontroverted testimony of Elder's coconspirators was more than sufficient to enable a rational jury to find Elder guilty of the charged conspiracy beyond a reasonable doubt.

Elder's arguments to the contrary are easily disposed of. He first argues that the evidence was insufficient because it "came from almost entirely biased witnesses." As we have said time and again, however, "[i]t is for the jury—not the court of appeals—to judge the credibility of witnesses, and attacks on witness credibility are insufficient to sustain a challenge to the sufficiency of the evidence." *United States v. Griffin*, 84 F.3d 912, 927 (7th Cir. 1996); *see also United States v. Curry*, 79 F.3d 1489, 1497 (7th Cir. 1996) (noting that arguments challenging witness credibility are "wasted on an appellate court" because "questions of credibility are solely for the trier of fact"). Indeed, "a conviction for conspiracy may be supported by testimony that is 'totally uncorroborated and comes from an admitted liar, convicted felon, large scale drug-dealing, paid government informant.'" *United States v. Pulido*, 69 F.3d 192, 206 (7th Cir. 1995). The testimony of Elder's coconspirators supports the verdict, and we will not second-guess the jury's assessment of their credibility. *See United States v. Rollins*, 544 F.3d 820, 835 (7th Cir. 2008).

Elder further argues that the evidence at trial was deficient because, when questioning Curinga on direct examination, the prosecution made a reference to "3.5 pounds" of methamphetamine in response to Curinga's testimony that Elder

asked him for "3.5 ounces." Elder argues that this discrepancy cast "enormous doubt" over Curinga's subsequent testimony that he regularly supplied Elder with multiple-pound shipments of methamphetamine. Once again, this argument fails at the outset because it was distinctly within the province of the jury to weigh the consistency of Curinga's testimony and assess his overall credibility. *See United States v. Muthana*, 60 F.3d 1217, 1223 (7th Cir. 1995) ("Assessing a witness'[s] credibility 'is a matter inherently within the province of the jury.'"). Elder also exaggerates the supposed inconsistency in Curinga's testimony. Notwithstanding his initial reference to "3.5 ounces," Curinga consistently testified, without prompting from the government, that he and Elder negotiated the sale of "large quantities" of methamphetamine; that, on several occasions, he supplied Elder with shipments of methamphetamine weighing more than three pounds each; that the drugs were carefully packaged in "one pound bricks" before being placed in the cooler; and that a single deal was worth tens of thousands of dollars.

Finally, Elder challenges Clark's testimony about the December 2012 drug exchange at the Phoenix hotel, arguing that Clark's identification of the exchanged substance as methamphetamine was based on "pure speculation." This argument borders on the frivolous. Clark testified that he had been using methamphetamine for the previous twenty years; that he routinely traveled to Arizona to buy methamphetamine from his coconspirators; and that, when he did so in December 2012, the substance he obtained from Elder looked like methamphetamine and produced the same effect as methamphetamine when he tried it. Clark's testimony, viewed in the light most favorable to the prosecution, supports a reasonable in-

ference that the substance supplied by Elder was metham-phetamine. *See United States v. Bradley*, 165 F.3d 594, 596 (7th Cir. 1999) (noting that it is "common sense" that those who use, buy, and sell illegal drugs are the "real experts" on what those drugs are).

All in all, the government presented substantial evidence showing that Elder procured, possessed, trafficked, and dis-tributed large amounts of methamphetamine, and that he did so in furtherance of the conspiracy charged in the superseding indictment. Elder's conviction is supported by sufficient evi-dence, and the jury's verdict must stand.

### C. Mandatory Life Sentence

As discussed earlier, the district court in this case reluc-tantly imposed a mandatory life sentence after concluding that Elder's prior two Arizona convictions (one in 1997 and one in 1999) qualified as "felony drug offenses" under 21 U.S.C. § 841. On appeal, Elder argues that his 1997 conviction was not a conviction for a felony drug offense because it was not punishable by more than one year imprisonment. Elder did not raise this argument at sentencing, so our review is for plain error only. *See United States v. Gray*, 332 F.3d 491, 492 (7th Cir. 2003); Fed. R. Crim. P. 52(b).

Under § 841's "three strikes" provision, a person who con-spires to distribute 50 grams or more of methamphetamine must be sentenced to life in prison if he has previously been convicted of two or more felony drug offenses. 21 U.S.C. § 841(b)(1)(A). For purposes of § 841, a prior offense is a "fel-ony drug offense" only if, among other things, it is "punisha-ble by imprisonment for more than one year." 21 U.S.C. § 802 (44). Although Elder's 1997 offense of conviction—possession

of drug paraphernalia in violation of Ariz. Rev. Stat. Ann. § 13-3415(A)—is presently punishable by imprisonment for more than one year, the offense carried a one-year maximum sentence at the time of Elder's conviction in 1997. *Compare* Ariz. Rev. Stat. Ann. § 13-702(D) (effective Jan. 1, 2009), *with* Ariz. Rev. Stat. Ann. § 13-701(C) (amended Jan. 1, 2009). As a consequence, Elder's 1997 conviction was not a conviction for a felony drug offense within the meaning of § 841, and the district court's finding to the contrary was plainly erroneous. The government agrees and correctly concedes that the mandatory life sentence was improper. We therefore vacate Elder's sentence and remand for a complete resentencing in conformity with this opinion.[2]

### III. CONCLUSION

For the foregoing reasons, we affirm Elder's conviction but vacate his sentence and remand for resentencing consistent with this opinion.

AFFIRMED IN PART; VACATED AND REMANDED IN PART.

---

[2] Elder also challenges the district court's finding that his 1999 Arizona conviction qualified as a felony drug offense. Because we conclude that Elder's sentence must be vacated based solely on the district court's erroneous finding regarding the 1997 conviction, we do not reach this additional argument. The parties are free to address the significance of the 1999 conviction on remand.