J-A08025-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DARNELL GILLIARD | : | |
| | : | |
| Appellant | : | No. 853 EDA 2023 |

Appeal from the Judgment of Sentence Entered December 16, 2022
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0005937-2019

BEFORE: BOWES, J., OLSON, J., and McLAUGHLIN, J.

MEMORANDUM BY OLSON, J.:           **FILED SEPTEMBER 30, 2024**

Appellant, Darnell Gilliard, appeals from the judgment of sentence entered on December 16, 2022, following his jury trial convictions for third-degree murder, conspiracy, and related firearms violations.[1] After careful consideration, we affirm.

The trial court summarized the facts of this case as follows:

On March 19, 2019, [Appellant], along with two co-conspirators, killed eighteen-year-old Nikolas Montez, the decedent, during a robbery. At approximately[] 11:38 p.m., Akeem Graham drove [Appellant] and Jermal Bizzel to the corner of Ontario and "F" [S]treets in a black Hyundai Sonata. As the decedent walked east on the 600 block of Ontario Street in Philadelphia[, Pennsylvania], a mere three houses south of his home, [Appellant] and Bizzel robbed the decedent at gunpoint.

---

[1] 18 Pa.C.S.A. §§ 2502(c) (third-degree murder), 903(a) (conspiracy), 6106(a) (firearms not to be carried without a license), 6108 (carrying firearms on public streets in Philadelphia), and 907 (possessing an instrument of crime), respectively.

During the robbery, the decedent was on [a cellular tele]phone with Gabriella Montanez, his paramour of one year, who heard the decedent tell the conspirators, "Take it. You can have it all." Montanez heard scuffling sounds and then gunshots. Montanez[] desperately asked the decedent if he was okay but the decedent did not respond. Immediately, Montanez ran to her mother and told her that she thought the decedent [had been] shot. After hearing police sirens, Montanez ended the call, so she could call [the] decedent's mother to tell her what happened.

As [Appellant] and Bizzel ran back to their waiting getaway car, Bizzel collapsed [outside the car] from two gunshot wounds to [his] chest[.] [Appellant] instruct[ed the driver,] Graham[,] to leave Bizzel at the scene [but] Graham helped the fatally injured Bizzel into the car and drove off. [Appellant] refused to go to the hospital with his co-conspirators and got out of the car before Graham arrived at Temple [University] Hospital with Bizzel.

After receiving a radio call, Philadelphia police arrived at the scene and rushed the decedent to Temple Hospital where they arrived mere seconds after the co-conspirators. Both the decedent and Bizzel died at the hospital shortly after their arrival. The decedent was shot five times at close range in the head, buttocks, left thigh, and knee.

The Philadelphia Police Crime Scene Unit recovered two .38/.357 caliber bullet jacket fragments, one bullet fragment of indeterminate caliber, and one .32 caliber bullet from the scene. From the decedent, the Medical Examiner recovered three .38/.357 caliber projectiles and four bullet fragments and, from Bizzel, he recovered two .32 caliber projectiles. [Hospital staff recovered an additional bullet fragment from the decedent.] The .32 caliber projectiles were fired from the same firearm. The ballistics evidence was inconclusive regarding whether the .38/.357 caliber projectiles were fired from the same firearm.

The day after the incident, [Demina] Johnson[, Bizzel's paramour,] called [Dorothy] Perkins, Graham's paramour and the owner of the black Hyundai Sonata, to learn about the details of [Bizzel's] death. On a three-way call [in which Graham, Johnson, and Perkins participated while Graham was in prison,] Graham explained that he was in the car when Bizzel was shot [and] that [Appellant] said [to] leave [Bizzel behind] after Bizzel collapsed outside the car. Graham told Johnson that[,] along with himself and Bizzel, [Appellant] was also at Johnson's home the night

- 2 -

before the incident. Perkins gave Johnson [Appellant's cellular tele]phone number, so she could learn more about Bizzel's death.

The next day, Johnson called [Appellant] and arranged a meeting at Sugar[H]ouse Casino [on North] Delaware Avenue. Between 9:00 p.m. and 10:00 p.m., Johnson and her aunt met with [Appellant] in a car in the parking lot of the casino[. Appellant []] was in the front passenger seat and an unknown male [was] in the driver's seat. Johnson unintentionally set her [cellular tele]phone to record the audio of the meeting.

Johnson confronted [Appellant] and asked for answers about what happened that night. [Appellant] confirmed that he was one of the individuals at Johnson's home the night before the incident and told her that she would know him by the nickname "D." [Appellant] further [confirmed that he was present during the incident. Appellant] confessed to Johnson that the robbery "just went bad" and the decedent and Bizzel shot each other. [Appellant] claimed that he took Bizzel's gun from the scene to protect him. When asked whether he or Graham was the driver, [Appellant denied driving.] [Appellant] confirmed that the police found a fake gun in the [escape] vehicle and that he instructed Graham to erase all of his communications when Graham called him from the back of [a] police car [after he was arrested].

Cell[ular telephone] site analysis of the co-conspirators' [] locations confirmed their movements [on] the day of the incident. All three [telephones belonging to the co-conspirators] were connected to the same close range Distributed Antenna System cell[ular] site covering the area of the crime scene at the time of the shooting [and their subsequent movements after the shooting.] After the shooting, [Appellant's] cell[ular tele]phone location diverges from his co-conspirators' [location] as they rush[ed] to Temple Hospital. After arriving at Temple Hospital, Graham's cell[ular tele]phone location [showed] when he was taken to police headquarters. On March 21, 2019, from approximately 9:12 p.m. to 9:36 p.m., [Appellant's] cell[ular tele]phone was connected to the cell site which covers Sugar[H]ouse Casino.

Graham's fingerprints were found on the front and rear passenger side doors of the black Hyundai and on two different beverage containers found in the vehicle. Bizzel's fingerprints were found on the back of the cell[ular tele]phone from the vehicle[']s glove

- 3 -

box. In addition[,] police also recovered a bb-gun from the black Hyundai.

On April 12, 2019, [Appellant] was arrested and, from his residence, police recovered a cell[ular tele]phone and a Sugar[H]ouse [C]asino receipt.

[Appellant] was not licensed to carry a firearm at the time of the incident.

Trial Court Opinion, 5/12/2023, at 2-5 (footnotes omitted or incorporated).

The case proceeded as follows:

On April 12, 2019, [Appellant] was arrested and charged with murder and related offenses. On October 18, 2022, [Appellant] elected to be tried by a jury. On October 24, 2022, a jury convicted [Appellant of the aforementioned crimes, but found him not guilty of robbery and conspiracy to commit robbery]. On December 16, 2022, [the trial] court sentenced [Appellant] to [10 to 20] years of incarceration for third-degree murder with consecutive sentences of six to [12] years for conspiracy to commit third-degree murder and one to two years of incarceration for [carrying a firearm without a license], for a total [aggregate] sentence of [17 to 34] years of incarceration. [The trial court imposed no further penalty for carrying a firearm in public in Philadelphia or possessing an instrument of crime.] On December 27, 2022, [Appellant] filed a post-sentence motion, which [the trial] court denied on March 3, 2023.

*Id.* at 1-2 (superfluous capitalization omitted; original footnotes omitted or incorporated). This timely appeal resulted.[2]

On appeal, Appellant presents two issues for our review:

I. Whether the trial court erred in denying [Appellant's] motion to suppress the recording made by Johnson of [] Appellant's statements about the crime, as [] Appellant did not consent to the recording and had an expectation of privacy?

_____

[2] Appellant filed a timely notice of appeal on March 31, 2023. On April 24, 2023, Appellant filed a timely, court-ordered concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). The trial court filed an opinion pursuant to Pa.R.A.P. 1925(a) on May 12, 2023.

> II. Whether the trial court err[ed] in permitting Demina Johnson to testify [at trial] as to what Akeem Graham, a non-testifying defendant, told her about who was involved and how the robbery was committed days after the crime as Graham's statements to Johnson were hearsay, not in furtherance of or during a conspiracy?

Appellant's Brief at viii (numerals supplied).[3]

In the first issue we examine, Appellant argues that pursuant to the Wiretapping and Electronic Surveillance Act (Wiretap Act),[4] the trial court erred by denying suppression of an audio recording of a conversation between Demina Johnson and Appellant. *Id.* at 25-35. As recounted by Appellant:

> Not long after the subject shooting, Johnson contacted [] Appellant to uncover what happened to Boozy [(a nickname for the co-conspirator named Bizzel who sustained fatal gunshot wounds during the incident.)] Johnson and [] Appellant arranged to meet in a car at the SugarHouse Casino in Philadelphia. The [] vehicle's occupants included Johnson, her aunt, [] Appellant, and an unidentified second male, each of whom were aware of the meeting's topic beforehand. Johnson recorded the conversation, in which Appellant admitted that he was with [both co-conspirators,] Graham and Boozy[,] during the subject shooting[, but] did not admit to participating in the shooting.

*Id.* at 27. Appellant claims that he did not consent to the recording and had an expectation of privacy in the vehicle where the conversation took place. *Id.* at 25. Appellant argues that the meeting was "pre-planned[,]" that "Appellant purposefully chose an isolated vehicle to eliminate others from hearing the conversation[,]" and that "the contained car was transformed into

---

[3] We have reordered Appellant's issues for ease of discussion and disposition.

[4] 18 Pa.C.S.A. §§ 5701-5782.

a private forum." *Id.* at 27 and 30. Appellant suggests that "whether [] Appellant owned the vehicle or where he sat during the conversation is [] irrelevant." *Id.* at 34. Appellant also contends that under the Wiretap Act, he was permitted to move to suppress the contents of the recording because Johnson unlawfully obtained the communications by intentionally intercepting, recording, and disclosing the information despite Appellant's expectation of privacy and, otherwise, without Appellant's consent. *Id.* at 29. "In sum, [Appellant argues that] because [he] took affirmative and reasonable steps showing an expectation that his conversation would not be overheard or recorded, an expectation that society is prepared to recognize, and Johnson failed to obtain consent from not just [] Appellant but all three of the car's occupants, a clear violation of the Wiretap Act occurred." *Id.* at 35. As such, Appellant asks "this Court to strike Johnson's recording from the evidence and grant Appellant a new trial." *Id.* at 36.

Our review of the denial of suppression

is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. We are bound by the suppression court's factual findings so long as they are supported by the record; our standard of review on questions of law is *de novo*. Where, as here, the defendant is appealing the ruling of the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted. Our scope of review of suppression rulings includes only the suppression hearing record and excludes evidence elicited at trial.

***Commonwealth v. McMahon***, 280 A.3d 1069, 1071 (Pa. Super. 2022)

(internal citation omitted).

> Additionally, our Supreme Court has
>
> note[d] that in the suppression context, appellate courts do not simply comb through the record to find evidence favorable to a particular ruling. Rather, appellate courts look to the specific findings of fact made by the suppression court.
>
> Those findings are dependent on the suppression court's credibility determinations. A suppression court may find some evidence favorable to the Commonwealth to be credible, and other evidence favorable to the Commonwealth to be incredible. Only after the court assesses and weighs all of the facts may the court issue conclusions of law specifically relating to those findings of fact. There is no mechanism for that special evaluative process to take place during a trial, especially when the case is being tried to a jury as the finder of fact.

***In re L.J.***, 79 A.3d 1073, 1085 (Pa. 2013). "If there is sufficient evidence of record to support the suppression court's ruling and that court has not misapplied the law, we will not substitute our credibility determination for that of the suppression court judge." ***Commonwealth v. Smith***, 808 A.2d 215, 220 (Pa. Super. 2002).

Appellant's opening claim rests on his contention that the Wiretap Act precluded the introduction at trial of a recorded conversation between himself and Johnson. Our Supreme Court has determined:

> In general, the Wiretap Act prohibits the interception, disclosure or use of any wire, electronic or oral communication.
>
> ***
>
> If a criminal defendant [] believes that evidence in the form of an "oral communication" was intercepted in violation of the Wiretap

Act, the Act permits [him] to make such a claim in a "motion to exclude." 18 Pa.C.S.A. § 5721.1(b). [...T]he Wiretap Act provides the following base definition of "oral communication:" "Any oral communication uttered by a person possessing an expectation that such communication is not subject to interception under circumstances justifying such expectation." 18 Pa.C.S.A. § 5702.

[Moreover, our Supreme] Court has held that, to establish a violation of the Wiretap Act, the claimant carries the burden to demonstrate, *inter alia*, that []he possessed an expectation that the communication would not be intercepted and that [his] expectation was justifiable under the circumstances. [***Agnew v. Dupler***], 717 A.2d [512,] 522 [(Pa. 1998)] (explaining that "to establish a *prima facie* case under the Wiretap Act for interception of an oral communication, a claimant must demonstrate: (1) that he engaged in a communication; (2) that he possessed an expectation that the communication would not be intercepted; (3) that his expectation was justifiable under the circumstances; and (4) that the [alleged intercepting party] attempted to, or successfully intercepted the communication, or encouraged another to do so"); ***see also*** [***Pennsylvania State Police v.***] ***Grove***, 161 A.3d at 901-02 (*citing* ***Agnew***, ***supra***, for the proposition that a "claimant alleging [a] Wiretap Act violation must show[,]" *inter alia*, "that he possessed an expectation that the communication would not be intercepted [and] that his expectation was justifiable under the circumstances"). Placing this burden on [the party aggrieved by an interception] is consistent with the plain language of the Wiretap Act and comports with common sense, as the Commonwealth would have no incentive to demonstrate that a defendant has a justifiable expectation that [his] oral communication would not be intercepted, and the Wiretap Act does not require the Commonwealth or any other party to prove a negative, *i.e.*, that the claimant did not have a justified expectation that [his] oral communication would not be intercepted under the circumstances of the case.

***Commonwealth v. Mason***, 247 A.3d 1070, 1080–1081 (Pa. 2021) (original brackets and some case citations omitted).

Additionally, this Court has "[e]xpressly [found] that there is a distinction between the [general] expectation of privacy and the expectation of non[-]interception" under the Wiretap Act. ***See Commonwealth v.***

***Myers***, 676 A.2d 662, 664 (Pa. Super. 1996). We have previously determined:

> It is interesting to note that in varying situations this analysis can yield differing results as to whether there is either an expectation of privacy or an expectation of non-interception. Generally, where there is an expectation of privacy there is also an expectation of non-interception. Such is not always the case, however. For instance, if one is being examined by his or her physician and knows from past experience that the doctor often carries a small tape recorder in a pocket to record patient interviews, one's expectation of non-interception is nearly non-existent, but the expectation of privacy is still extremely high. On the other hand, if one is speaking with the town gossip at a public swimming pool under circumstances insuring that the gossip is not wearing a body wire, one's expectation of non-interception is very high, but the expectation of privacy is very low. Thus, an expectation of privacy does not always carry a concomitant expectation of non[-]interception, and *vice versa*.

***Commonwealth v. McIvor***, 670 A.2d 697, 700 (Pa. Super. 1996) (*en banc*).

Here, the trial court determined that Appellant did not have an expectation of privacy in the vehicle where the recording took place. More specifically, the trial court determined that Appellant "had no expectation of privacy in someone else's vehicle, especially when [Appellant] voluntarily invited Johnson into the car and chose to disclose his crimes." Trial Court Opinion, 5/12/2023, at 7. The trial court opined that there were a total of four people in the automobile, so "two other people were [also] present for the conversation." ***Id.***; ***see also*** N.T., 10/19/2022, at 14. As such, the trial court determined that Appellant did not have an expectation of privacy in the subject vehicle, when he voluntarily spoke to Johnson and her aunt, who were

- 9 -

practically strangers to him. **See** N.T., 10/19/2022, at 21 (Johnson did not know Appellant before this meeting).

Upon review, we conclude that the trial court did not err in finding that Appellant failed to meet his burden of proving an expectation of privacy or non-interception under the circumstances presented herein. In this case, Appellant bore the burden of proof to show he had an expectation of privacy or non-interception in the vehicle in question and he did not do so. Johnson was the only witness to testify at the suppression hearing; Appellant did not present any evidence. As set forth above, Appellant agreed to meet with Johnson two days after the incident at issue. He did not meet with her alone. Instead, Appellant met with Johnson, with two other people present, in an unidentified man's vehicle. **See** N.T., 10/19/2022, at 11-14 and 32-33. As the trial court properly determined, Appellant spoke in front of two women whom he did not know and, therefore, he did not establish that he had an expectation of privacy inside the vehicle. Moreover, although Johnson did not obtain Appellant's consent to record the conversation, there is also no evidence that Appellant asked if his statements would be recorded or that he attempted to discover or secure recording devices possessed by Johnson or her aunt. **Id.** at 29. Appellant failed to make these inquiries and undertake such efforts despite his awareness that the meeting with Johnson and the others had been mutually arranged to assist Johnson in uncovering how her

paramour received fatal wounds during the recent robbery attempt.[5] Accordingly, there was no evidence presented that Appellant had a reasonable expectation that his statements would remain private or that his communications would not be recorded or intercepted. As such, Appellant did not prove that he possessed an expectation that the oral communication would not be intercepted and that his expectation was justifiable under the circumstances. For all of the foregoing reasons, we conclude that the trial court did not abuse its discretion or err as a matter of law in denying suppression of Johnson's recording. Accordingly, this issue does not merit relief.

In his second issue presented, Appellant argues that the trial court erred by permitting Johnson to testify about statements Akeem Graham, a non-testifying co-defendant, made to her regarding the conspiracy plot and the parties involved. *Id.* at 5. Appellant asserts that "Graham's statements to Johnson were inadmissible hearsay, failing to meet any hearsay exception[,] lacked *indicum* of reliability[,] and prejudiced [] Appellant by permitting and endorsing a non-testifying co-conspirator's inadmissible, incriminating, unredacted, [statement without] a limit[ing] jury instruction[.]" *Id.* (hyphens omitted). Appellant maintains that Graham's statements were not made during or in furtherance of a conspiracy, because his statements

---

[5] Owing to the prevalence of smartphone technology within our society, one of the circumstances we bear in mind in our analysis is that a substantial segment of the population maintains, within its possession at all times, a device capable of recording oral communications.

were made "after the subject shooting while he was incarcerated." *Id.* at 9 and 11. Appellant argues that "[w]hen Graham and Johnson spoke, … the robbery, the shooting, and [] flight" from the scene had already concluded and Graham's statements "related to past events[.]" *Id.* at 11. Appellant states that Graham's statements were not used to show Johnson's course of conduct. *Id.* at 6. Instead, Appellant asserts that Johnson was not a part of the conspiracy, she merely had a romantic relationship with a co-conspirator. *Id.* Because no exception to hearsay applies, Appellant contends that the admission of Graham's statements to Johnson violated the Sixth Amendment's Confrontation Clause. *Id.* at 16. Finally, Appellant argues that the error in admitting Graham's statements prejudiced him and did not amount to harmless error. *Id.* at 16-25.

> We adhere to the following standards:
>
> An appellate court's standard of review of a trial court's evidentiary rulings, which include rulings on the admission of hearsay, is abuse of discretion. However, whether a defendant has been denied his right to confront a witness under the Confrontation Clause of the Sixth Amendment to the United States Constitution, made applicable to the States *via* the Fourteenth Amendment, is a question of law, for which our standard of review is *de novo* and our scope of review is plenary.
>
> Hearsay is an out-of-court statement offered for the truth of the matter asserted. Hearsay generally is inadmissible unless it falls within one of the exceptions to the hearsay rule delineated in the Pennsylvania Rules of Evidence.

*Commonwealth v. Rivera*, 238 A.3d 482, 492 (Pa. Super. 2020) (internal citations and original brackets omitted).

Out-of-court statements may be offered as an exception to hearsay when the statement "was made by the party's coconspirator during and in furtherance of the conspiracy." Pa.R.E. 803(25)(e). This Court has stated:

> To lay a foundation for the co-conspirator exception to the hearsay rule, the Commonwealth must prove that: (1) a conspiracy existed between declarant and the person against whom the evidence is offered and (2) the statement sought to be admitted was made during the course of the conspiracy. In addition, there must be evidence other than the statement of the co-conspirator to prove that a conspiracy existed.

*Commonwealth v. Feliciano*, 67 A.3d 19, 27 (Pa. Super. 2013) (internal citations omitted).

Moreover,

> [u]nder this exception, the out of court declarations of a co-conspirator may be introduced against another co-conspirator provided three requirements are satisfied. The prosecution must prove the existence of a conspiracy between the declarant and the defendant against whom the evidence is being offered. Once this requirement is satisfied the Commonwealth must show that the statements were made during the course of the conspiracy, and finally that the statements were made in furtherance of the common design.

*Commonwealth v. Mayhue*, 639 A.2d 421, 431 (Pa. 1994) (citation omitted).

Furthermore, the Pennsylvania Supreme Court has also determined:

> Generally, it has been held that, in order to satisfy the in-furtherance-of requirement of the coconspirator hearsay exception, it is sufficient for the government to establish an intent to promote the conspiratorial objective. *See*, *e.g.*, *United States v. McCullah*, 76 F.3d 1087, 1103 (10th Cir.1996). In a number of circumstances, however, where [] the inculpatory statements are narrative declarations of past activity made to a non-participant in the asserted conspiracy, courts have found the

essential in-furtherance-of attribute absent. ***Cf. United States v. Johnson***, 200 F.3d 529, 533 (7th Cir. 2000) (citing cases distinguishing statements made in furtherance of a conspiracy from, *inter alia*, narrative declarations); ***United States v. Provenzano***, 620 F.2d 985, 1001 (3d Cir.1980) (distinguishing statements made to third parties from those made to coconspirators); ***accord United States v. Gibbs***, 739 F.2d 838, 845 (3d Cir. 1984) (observing that "statements made to those who are not involved in the conspiracy are not 'in furtherance' of it"). ***See generally*** 23 C.J.S. CRIMINAL LAW § 990 (2002) ("Generally speaking, unauthorized admissions or confessions, or casual admissions of guilt, cannot be considered in furtherance of the conspiracy or enterprise and are inadmissible." (footnotes omitted)).

***Commonwealth v. Johnson***, 838 A.2d 663, 675–676 (Pa. 2003).

Here, Johnson was not a member of the conspiracy at issue and Graham's statements were not made during or in furtherance of the conspiracy. Instead, Graham made the statements at issue inculpating Appellant while imprisoned following the crimes discussed herein. Those statements were narrative declarations of past activity made to Johnson, a non-participant in the asserted conspiracy, and, as such, could not be considered in furtherance of the conspiracy. Accordingly, Graham's statements were hearsay, not subject to the co-conspirator exception under Rule 803(25)(e). Hence, the trial court erred by admitting Graham's statements as hearsay exceptions.

We turn now to determine whether the error was harmless. Our Supreme Court has opined:

In ***Bruton*** [***v. United States***, 391 U.S. 123 (1968)], the United States Supreme Court held that a defendant is deprived of his rights under the Confrontation Clause of the Sixth Amendment when his non-testifying codefendant's confession implicates

defendant as a coparticipant in the crime. ***Bruton*** was tempered by ***Schneble v. Florida***, 405 U.S. 427, (1972), where the Court held that the harmless error doctrine applies to ***Bruton*** violations.

The ***Schneble*** harmless error doctrine states that where the evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, reversal is not required. ***Id.***; ***see also Commonwealth v. Williams***, 573 A.2d 536 (Pa. 1990).

***Commonwealth v. Travaglia***, 661 A.2d 352, 359 (Pa. 1995).

Our Supreme Court has further found that "[a]n error is harmless if it could not have contributed to the verdict." ***Commonwealth v. Wright***, 961 A.2d 119, 143 (Pa. 2008) (citation omitted). "In other words, an error cannot be harmless if there is a reasonable possibility the error might have contributed to the conviction." ***Id.*** (citation omitted). More specifically, our Supreme Court has "found harmless error where: (1) the error did prejudice the defendant or the prejudice was *de minimis*; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict." ***Id.*** (citation omitted).

Here, the trial court determined:

Even if Graham's statements were not admissible, any potential error would be harmless because it could not have contributed to the verdict. [] Graham's statements to Johnson were cumulative of [Appellant's] own recorded statement to Johnson. [Appellant] described how 'it just went bad' and the [victim] and Bizzel shot each other. [Appellant] confirmed that he was not the driver of the get-away vehicle and claimed that he tried to help Bizzel into the vehicle. […] Furthermore, the prejudicial effect of any error

- 15 -

was so insignificant to the overwhelming evidence presented in this case that the error could not have contributed to the verdict given [Appellant's] lengthy confession to Johnson [coupled with] the cell site locations of the co-conspirators' cell[ular tele]phones during the incident.

Trial Court Opinion, 5/12/2023, at 10.

Upon review of the record and applicable law, we agree with the trial court's assessment and deem the admission of Graham's statements harmless in light of the cumulative and overwhelming evidence of guilt presented at trial. The prejudicial effect of Graham's statements was so insignificant by comparison where, as here, the jury heard Appellant's own recorded confession which was properly admitted into the record as previously determined. As such, Graham's erroneously admitted hearsay statements to Johnson were merely cumulative of Appellant's own, properly admitted statements. Moreover, there was corroborating evidence of all of the co-defendants' locations *via* cellular telephone data before and after the crimes, including Appellant's location at the SugarHouse Casino on the day he was recorded by Johnson. For all of the foregoing reasons, we conclude that Appellant is not entitled to relief.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/30/2024

- 16 -