In the

# United States Court of Appeals
## For the Seventh Circuit

No. 22-2666

MONTA ANDERSON,

*Petitioner-Appellant,*

*v.*

UNITED STATES OF AMERICA,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 17-cv-01542 — **Michael M. Mihm**, *Judge.*

ARGUED MAY 19, 2023 — DECIDED FEBRUARY 26, 2024

Before FLAUM, ROVNER, and ST. EVE, *Circuit Judges.*

ROVNER, *Circuit Judge.* In this collateral challenge to his conviction, *see* 18 U.S.C. § 2255, petitioner Monta Anderson seeks to vacate his guilty plea on the ground that it was not knowing and voluntary due to his plea counsel's alleged ineffective assistance. Specifically, Anderson asserts that his counsel advised him to plead guilty to conspiring to distribute heroin in violation of 21 U.S.C. § 841(a)(1) (effective Aug.

3, 2010 to Dec. 20, 2018),[1] stipulate to having distributed heroin that resulted, *inter alia*, in the death of James Reader, *see* § 841(b)(1)(A), and accept an agreed-upon sentence of 20 years pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C)—ostensibly in order to avoid a potential mandatory minimum prison term of life—without first consulting with a toxicology expert on the question of whether the heroin Anderson distributed was in fact a but-for cause of Reader's death. *See Burrage v. United States*, 571 U.S. 204, 218–19, 134 S. Ct. 881, 892 (2014). When this case was last before us, we concluded that Anderson had articulated a viable claim of attorney ineffectiveness and remanded for an evidentiary hearing. *See Anderson v. United States*, 981 F.3d 565, 577–78 (7th Cir. 2020) ("*Anderson I*").

Based on the testimony presented at that hearing, Anderson has now shown that consultation with a toxicology expert would have revealed the government's inability to prove beyond a reasonable doubt that the heroin he supplied to Reader was a but-for cause of Reader's death. Within the framework of our prior opinion, that showing likely would have been sufficient to establish that his plea counsel indeed was ineffective for failing to consult with such an expert. As the case was briefed and argued to us previously, it was the death-results enhancement that drove the prospective mandatory minimum prison term of life. The government did not dispute that if consultation with a medical expert would have revealed that the prosecution could not meet its burden of proof as to that enhancement, a mandatory sentence of life in

---

[1] Unless otherwise indicated, our citations to section 841 are to the 2010 version in effect at the time of the offense and when Anderson was indicted in 2013.

prison would have been off the table and Anderson would have faced, at worst, a mandatory minimum term of 20 years, not life. Consistent with the premise of our prior opinion, Anderson would have thus established that he was prejudiced by his plea counsel's ineffectiveness.

However, the government now argues that there were two other grounds on which Anderson would have been subject to a mandatory life term apart from the death-results enhancement, such that Anderson was not prejudiced by his counsel's failure to consult with a toxicologist. This line of argument was developed on remand and relied upon by the district court below in denying Anderson relief. Although it turns out that Anderson's criminal history did not meet the criteria for one of these two alternative bases for a mandatory life term, we do agree that Anderson would have faced a mandatory life term given that he had at least one prior felony drug conviction and two individuals suffered serious bodily injuries when they overdosed on heroin that Anderson had supplied and required urgent intervention to resuscitate them. *See* § 841(b)(1)(A).

For this reason, we agree with the district court that Anderson ultimately was not prejudiced by any ineffectiveness on the part of his plea counsel: given that a mandatory life term remained on the table even without the death-results enhancement, pleading guilty and securing the benefit of a 20-year term was an eminently reasonable, positive outcome for Anderson. We therefore affirm the district court's judgment.

**I.**

Beginning in 2010, Anderson participated in a conspiracy to distribute heroin in central Illinois. Anderson obtained the

heroin from a supplier in Chicago and distributed it to both dealers and users in central Illinois. Among the dealers whom Anderson supplied was Anthony Mansini. The pre-sentence report ("PSR") adopted by the district court at sentencing estimated conservatively that Anderson's overt acts in furtherance of the conspiracy involved 1.6 kilograms of heroin; of that total, Anderson distributed 900 grams to Mansini. Crim. R. 111 at 6, 8 (Revised PSR ¶¶ 25, 35).[2]

On August 25, 2012, during the course of the conspiracy, Reader made two purchases of heroin. The first was from a dealer in Peoria unconnected to either Mansini or Anderson. Reader ingested that heroin early in the afternoon but indicated to the person with whom he was using heroin that he was not experiencing the high he desired. He then purchased heroin for a second time, this time from Mansini, who in turn had obtained the heroin from Anderson. After Reader ingested that second quantity of heroin, he died. The toxicology report on Reader would indicate the presence of both heroin metabolites (including morphine) and Benadryl in his system. The coroner's report identified the cause of Reader's death as "opiate intoxication" (R. 66-2 at 70) but did not attribute the death to either the first or second doses of heroin that Reader consumed, nor did it make findings as to the incremental effects of any other drugs in Reader's system. In junior and senior high school, Reader had been a star athlete with a strong academic record who dreamed of playing college basketball and studying marine biology, but those dreams were derailed

---

[2] References to "Crim. R." are to the record in the criminal case that culminated in Anderson's guilty plea and conviction, No. 1:13–cr–10064–MMM-JEH. References to "R." are to the record in the civil case that resolved Anderson's section 2255 motion.

when he began using heroin at age 18. He had struggled with addiction and had overdosed on five prior occasions, but according to his parents, he was in recovery, was working a steady job, and had refrained from heroin use in the eleven months prior to his fatal relapse. Reader was 21 years old.

Also during the course of the conspiracy, between September and early November 2012, two other individuals overdosed on heroin that Anderson purportedly had supplied: Haley Heilman and William Holmes. Heilman was a criminal associate of Anderson's: beginning in 2011, she regularly drove him to Chicago to pick up heroin from his supplier, and he compensated her with user-quantities of heroin. Crim. R. 111 at 5 (Revised PSR ¶ 17). Heilman overdosed twice: on the first occasion in October 2012, after ingesting heroin she had obtained from Mansini—which Mansini had obtained from Anderson—Heilman was revived by paramedics with Narcan®[3] en route to a hospital; on the second occasion, in late October or early November 2012, after ingesting heroin she and a co-defendant had purchased directly from Anderson, Heilman was once again revived at the hospital with Narcan®. Crim. R. 111 at 6 (Revised PSR ¶¶ 28–29). Holmes was one of Mansini's customers: he initially purchased user-sized quantities of heroin from Mansini and over time began to make larger, distribution-sized purchases. Holmes overdosed in September or October 2012 after buying heroin from Jesse Peak, who in turn had obtained the heroin from Mansini. Mansini's primary source of heroin at that time was Anderson. Holmes was revived with cardio-pulmonary resuscitation ("CPR") administered by a friend who noticed that he

---

[3] Narcan® is a brand name for naloxone, a medication that works as an opioid antagonist to reverse the effects of an opioid overdose.

had stopped breathing and his face had turned blue. R. 111 at 7 (Revised PSR ¶ 30).

A grand jury indicted Anderson and four co-defendants in May 2013 with conspiring to distribute heroin in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). (The charged conspiracy involved more than those five individuals; others were charged separately.) The indictment alleged that the conspiracy began in 2010 and continued through the date of the indictment, that it involved over 1000 grams of heroin, and had resulted in death and serious bodily injury. The government also filed two notices pursuant to 21 U.S.C. § 851 identifying three prior felony drug convictions that would trigger statutory enhancements to Anderson's prospective sentence: a 2006 conviction in Lake County, Illinois for possession of cocaine; a 2009 conviction in Lake County for attempted possession of heroin; and a 2013 conviction in Peoria County, Illinois for unlawful possession of heroin. Additionally, there were two other felony drug convictions in Anderson's criminal history not included in the section 851 notices that potentially might qualify as predicates sufficient to trigger an enhanced statutory penalty: a 2000 conviction in Cook County, Illinois for possession of 30–500 grams of cannabis and another conviction from the same year, also in Cook County, for the manufacture/delivery of 1–15 grams of cocaine.

Given Anderson's criminal history and the events that took place over the course of the conspiracy, there were three ways that Anderson potentially could be subject to a mandatory life term: (1) at least two of Anderson's prior convictions qualified as felony drug offenses, as defined in 21 U.S.C. § 802(44); (2) one of his prior convictions qualified as a felony

drug offense and death resulted from the heroin that Anderson distributed, *or* (3) one of his prior convictions qualified as a felony drug offense and serious bodily injury resulted from the heroin that Anderson distributed. § 841(b)(1)(A)(i).

Also, as the government pointed out at the evidentiary hearing below and in its brief on appeal, there were three ways that Anderson could be subject to a mandatory minimum term of 20 years in prison (with a maximum possible term of life): (1) at least one of Anderson's prior convictions constituted a felony drug offense,[4] (2) death resulted from the heroin that Anderson distributed, *or* (3) serious bodily injury resulted from the heroin that Anderson distributed. § 841(b)(1)(A)(i).

After private counsel withdrew from representing Anderson in August 2014, the district court appointed attorney Michelle N. Schneiderheinze to represent Anderson pursuant to the Criminal Justice Act. Schneiderheinze represented Anderson for the remainder of the criminal proceedings in the district court. It was Schneiderheinze who negotiated the Rule 11(c)(1)(C) plea agreement at issue here.

Schneiderheinze would later testify that she believed there were factual grounds on which to challenge the government's theory that Anderson had supplied the second dose of heroin to Reader (for example, Mansini had made conflicting statements about the source of the heroin he sold to Reader) and that the second dose was a but-for cause of Reader's death, but that it would have been necessary for her to consult with

---

[4] Section 401(a)(2)(A) of the First Step Act of 2018, P.L. 115-391, 132 Stat. 5194, 5220 (Dec. 21, 2018), reduced the penalty for this aggravating factor from 20 to 15 years.

a toxicologist in order to fully evaluate the strength of the government's case on the latter point. However, in the course of negotiating the plea, the prosecutor was adamant that Anderson stipulate to being responsible for Reader's death. And as we discuss below, Schneiderheinze believed that there was a real possibility that Anderson might receive a mandatory sentence of life if he proceeded to trial even if he ultimately prevailed on the death-results issue, so she thought the 20-year deal was a good one and advised Anderson to take it. "It was the best sentencing outcome for him that I thought I could get," Schneiderheinze testified. R. 52 at 192–93. "And it was guaranteed." R. 52 at 193.

Pursuant to the plea agreement dated February 3, 2015, Anderson agreed to plead guilty and accept a sentence of 20 years' imprisonment. He stipulated in the agreement that "the government will prove that as an overt act of this conspiracy [Anderson] provided the heroin that led to the death of James Reader and the serious bodily injury suffered … as a result of heroin overdose of Haley Heilman and William Holmes." Crim. R. 81 at 12 (Plea Agreement ¶ 22). In his plea colloquy, Anderson acknowledged having at least one prior felony drug conviction and that without the agreement he faced a minimum prison term of 20 years up to a maximum term of life. As for the "death-results" enhancement, he indicated that the facts regarding Reader's death were not as straightforward as the plea agreement made them out to be, but for purposes of his plea he would not dispute that his heroin distribution caused Reader's death. R. 125 at 19, 36–41. Pursuant to the plea agreement, Anderson waived the right to challenge his conviction and sentence except as to the ineffectiveness of his counsel. R. 81 at 5–6 (Plea Agreement ¶ 12). The district

judge postponed his decision on whether to accept the guilty plea pending review of the PSR.

The probation officer's PSR indicated that, absent the plea agreement's specified sentence of 20 years, the Sentencing Guidelines would call for a sentence of life. The probation officer found Anderson responsible for distributing a total of 1.6 kilograms of heroin, and because Reader's death resulted from Anderson's heroin distribution, the base offense level was 43. Crim. R. 111 at 10 (Revised PSR ¶ 43); *see* U.S.S.G. § 2D1.1(a)(1) (Nov. 2014). Anderson's possession of a gun during the charged conspiracy added two levels, § 2D1.1(b)(2), and his role as a manager or supervisor added another three levels, § 3B1.1(b), whereas his acceptance of responsibility in pleading guilty brought the adjusted offense level down two levels, § 3E1.1(a) to a nominal level of 46. Crim. R. 111 at 10–11 (Revised PSR ¶¶ 44, 46, 50). But because the Guidelines identify level 43 as the maximum offense level for all but the most extreme cases, 43 was the final adjusted offense level. U.S.S.G. Ch. 5, Pt. A comment. (n.2); Crim. R. 111 at 11 (Revised PSR ¶ 52). Coupled with Anderson's criminal history category of VI, the Guidelines called for a sentence of life in prison. Crim. R. 111 at 26 (Revised PSR ¶ 132). But subject to the district judge's acceptance of the Rule 11(c)(1)(C) agreement, the agreed-upon sentence of 20 years would bind the court and supplant the advisory Guidelines sentence. R. 111 at 26 (Revised PSR ¶134).

At the sentencing hearing in October 2015, the district judge formally accepted the plea agreement after questioning the parties' counsel at some length about the facts of the case and the rationale underlying the agreed-upon sentence of 20 years. The judge indicated he came "very close" to rejecting

the agreement given the seriousness of the offense—in addition to Reader's death, which was attributed to Anderson, an additional three or four deaths were attributed to Mansini—and the life term specified by the statute and the Guidelines. R. 126 at 37. But the judge was ultimately satisfied that there were material differences between Anderson and Mansini (who had been sentenced to a 24-year term) and that the plea agreement "[was] minimally sufficient given all the various sentencing factors." R. 126 at 37. The judge sentenced Anderson to the agreed-upon term of 240 months, with credit for the 17 months Anderson had served on a state conviction (the 2013 Peoria County conviction) that involved relevant conduct vis-á-vis the federal conspiracy, for a total of 223 months.

Not long after he was sentenced, Anderson began to rethink his plea and filed his first appeal, which this court later dismissed pursuant to *Anders v. California*, 386 U.S. 738, 87 S. Ct. 1396 (1967), as lacking any non-frivolous issue to pursue. *United States v. Anderson*, 650 F. App'x 274 (7th Cir. 2016). While that appeal was pending, Anderson filed a motion to withdraw his guilty plea, which the district court denied; this court subsequently held in a second appeal that the district court lacked jurisdiction over that motion given that his direct appeal was pending at the time. *United States v. Anderson*, 670 F. App'x 407 (7th Cir. 2016).

Finally, Anderson filed a pro se section 2255 motion which contended that his guilty plea was not knowing and voluntary because he received ineffective assistance of counsel in connection with the plea decision and that but for his attorney's errors, he would not have accepted the plea agreement and would not have pleaded guilty. Anderson's motion was focused on the death-results enhancement. He argued that

Schneiderheinze did not adequately discuss with him the government's burden under *Burrage* to prove beyond a reasonable doubt that the heroin he distributed was a but-for cause of Reader's death. 571 U.S. at 210, 218–19, 134 S. Ct. at 887, 892. Nor, Anderson alleged, did Schneiderheinze adequately investigate the cause of Reader's death. Had she done so, he contended, she would have realized that the government could not meet its burden under *Burrage*. R. 10.

At the government's request, the district court ordered Schneiderheinze to submit an affidavit in response to Anderson's section 2255 motion. Among other points, the court directed Schneiderheinze to discuss what advice she had given Anderson regarding the death-results enhancement. R. 13. On that point, the narrow affidavit that Schneiderheinze prepared indicated that: (1) She had shared with Anderson the discovery materials the government had produced, including the toxicologist's report regarding Reader; (2) Anderson was aware of the need for a medical expert to interpret the medical reports concerning Reader's death; (3) Anderson authorized Schneiderheinze to engage in plea negotiations without hiring a medical expert; and (4) Schneiderheinze was not trained to interpret the Reader toxicology results and had not discussed those results with anyone who had such training, so she could not assess the validity of Anderson's doubts regarding the cause of Reader's death. R. 16-1.

For its part, the government urged the district court to deny Anderson's section 2255 motion. In its view, Schneiderheinze had been effective in negotiating a plea agreement that avoided a mandatory sentence of life. The government also argued that there was no evidentiary support for the notion that consulting with a medical expert would have enabled

Anderson to defeat the death-results enhancement. In its memorandum, the government made no mention of any other basis on which Anderson faced a life sentence apart from the death-results enhancement coupled with one prior felony conviction for a drug offense. R. 16.[5]

The district court denied the section 2255 motion without an evidentiary hearing. R. 18. Having presided over Anderson's change-of-plea hearing, the judge was satisfied that Anderson had knowingly and voluntarily pleaded guilty, and specifically that he did so despite his awareness that he might have a factual defense to the death-results enhancement. R. 18 at 5–6. "[Anderson's] current self-serving claim that he was unaware of the availability of a but-for defense is simply not credible in light of the documentation before the court." R. 18 at 6. And because the record before the court indicated that Schneiderheinze had provided Anderson with the effective assistance of counsel during the plea negotiations, R. 18 at 5, the district court concluded that there was no need for further inquiry into the validity of Anderson's plea.

Anderson appealed. Although the district court had denied Anderson a certificate of appealability, *see* 28 U.S.C. § 2253(c), this court granted him such a certificate and appointed counsel to represent him on appeal.

As Anderson framed his ineffectiveness claim in that appeal, it was the death-results enhancement that drove the prospective sentence of life and in the absence of that

---

[5] The government did point out that the plea agreement incorporated the parties' stipulation that Anderson was subject to a 20-year minimum term and a maximum term of life because Anderson's heroin distribution resulted in death *and* serious bodily injury. R. 16 at 2.

enhancement, a mandatory life term would have been off the table.[6] At worst, Anderson postulated, he would have been subject to a statutory minimum term of 20 years, and perhaps an advisory Guidelines sentence of slightly more than that. For that reason, it was ineffective for his plea counsel not to look further into the cause of Reader's death. Had Schneiderheinze consulted with a medical expert, Anderson reasoned, she would have discovered that the government would not be able to prove beyond a reasonable doubt that Anderson's heroin was a but-for cause of Reader's death.

On the premise that, absent the death-results enhancement, he was facing at most a mandatory minimum prison term of 20 years, Anderson argued that Schneiderheinze's failure to investigate and demonstrate the lack of evidentiary support for the enhancement prejudiced him in that he would have opted for trial rather than pleading guilty, knowing that even if convicted he was likely to face a sentence at or near the 20-year term for which the plea agreement provided. *See Lee v. United States*, 582 U.S. 357, 364–65, 371, 137 S. Ct. 1958, 1965, 1968–69 (2017); *Hill v. Lockhart*, 474 U.S. 52, 59, 106 S. Ct. 366, 370 (1985); *see also Brock-Miller v. United States*, 887 F.3d 298, 311–12 (7th Cir. 2018) (discussing variations on the *Hill* standard for cases in which counsel's ineffectiveness has led

---

[6] Anderson's briefs in the prior appeal tended to focus on what the advisory Guidelines sentence might be depending on whether he was deemed responsible for Reader's death, but of course it is the statute itself which imposes mandatory minimum terms depending on particular aggravating factors. *See* § 841(b)(1)(A)(i).

defendant to opt for trial rather than plead guilty or has
caused him not to accept earlier, more favorable plea offer).[7]

---

[7] Secondarily, Anderson also postulated that Schneiderheinze, armed
with a strong defense to the death-results enhancement, might have been
able to negotiate a more favorable plea agreement, *i.e.,* one calling for a
term of less than 20 years. We note that this circuit has yet to accept as
valid a prejudice theory positing that absent plea counsel's ineffectiveness,
the defendant would have negotiated a different, more favorable plea
agreement. *See Bethel v. United States*, 458 F.3d 711, 720 & n.14 (7th Cir.
2006); *see also United States v. Dominguez*, 998 F.3d 1094, 1116–17 (10th Cir.
2021) (expressing doubt as to the validity of this theory of prejudice and
collecting cases, including *Bethel*). Our more recent opinion in *Brock-Miller*
notes that the Supreme Court's decision in *Missouri v. Frye*, 566 U.S. 134,
148, 132 S. Ct. 1399, 1409–10 (2012), comes the closest to establishing a prej-
udice standard for situations in which, but for counsel's ineffectiveness, a
better plea agreement might have been negotiated without the specter of
an improper sentence enhancement—in *Brock-Miller*, a recidivist enhance-
ment—hanging over the negotiations. 887 F.3d at 312. *Frye* concerned plea
offers that defense counsel never communicated to the defendant and
which then expired; the terms of those offers were significantly more fa-
vorable than the sentence the defendant ultimately received pursuant to a
blind guilty plea. The petitioner in *Brock-Miller* alleged that had her coun-
sel recognized that she was not subject to the recidivist enhancement, she
would have rejected the government's plea offer and either gone to trial
*or* negotiated a better plea agreement consistent with the deals entered
into by multiple co-defendants who had pleaded guilty to reduced drug
quantities or lesser included offenses. We remanded for an evidentiary
hearing as to both of these alternative theories of prejudice. *Id.* at 313. On
remand, the parties resolved the case by agreement without a hearing and
findings by the court. Thus, although *Brock-Miller* may have left the door
open to a finding of prejudice based on the prospect of negotiating a better
plea deal than the one the defendant entered into, we have yet to fully
embrace and define the boundaries of such a theory. Consistent with our
previous opinion, we refrain from exploring the merits of this theory here
and instead confine ourselves to Anderson's first and primary theory of

(continued)

Notably, the government's response brief implicitly accepted the premise of Anderson's appellate case. Nowhere in its brief did the government argue that, wholly apart from the death-results enhancement, Anderson potentially faced a statutory minimum term of life in prison, whether due to the serious bodily injury enhancement in combination with one prior felony drug conviction, or due to two prior felony drug convictions.[8] Instead, the government argued that because, without the death-results enhancement, Anderson still faced a 20-year statutory minimum term and a Guidelines sentencing range topping out at a bit more than 24 years—in other words, a sentence either the same as, or somewhat worse than the one specified in his plea agreement—he could not show that he was prejudiced by any ineffectiveness on his attorney's part in failing to consult with a medical expert regarding the death-results enhancement.

With the case presented to us on those terms, we vacated the district court's judgment and remanded with directions to conduct an evidentiary hearing. *Anderson*, 981 F.3d 565. We

---

prejudice, which is that he would have taken his chances at trial had he realized that the government would not be able to sustain its burden of proof as to the death-results enhancement.

[8] The government's brief, while outlining section 841 and its penalty structure, did note briefly that the enhancement for a serious bodily injury, coupled with one prior felony drug conviction, could trigger a statutory mandatory minimum term of life; its counsel acknowledged the same at oral argument in response to a question from a panel member. Appeal No. 19-1257, R. 24 at 15, 41 (Gov. Br. at 8, 34 & n.8); Oral Arg. 10-29-2020 at 23:40–24:44. Even so, the government did not cite the serious-bodily-injury enhancement or another path to a life term as a reason why any ineffectiveness on the part of Schneiderheinze in failing to investigate the death-results enhancement did not prejudice Anderson.

confined our analysis to Anderson's first and principal theory
of prejudice: that had his counsel provided effective assis-
tance as to the death-results enhancement, he would not have
accepted the terms of the plea agreement and would not have
pleaded guilty. The record indicated that Schneiderheinze
had not conducted an investigation into the death-results en-
hancement: specifically, she had not consulted with a toxicol-
ogist or other medical expert. We accepted the premise of An-
derson's contention that, had counsel looked more closely at
the factual basis for the death-results enhancement, she
would have realized there was a meritorious defense to the
enhancement: given that Reader had ingested two heroin
doses on the day he died, only the second of which came from
Anderson, it was possible that the first dose, whether alone or
in combination with the Benadryl found in his system, might
have been independently sufficient to cause his death. *Id.* at
573–76.

Anderson also asserted that but for his counsel's deficient
performance, he would have gone to trial rather than accept-
ing the plea agreement, and we agreed with him that he had
made a sufficient preliminary showing of prejudice in this re-
gard to warrant a hearing. Specifically, Anderson alleged that
absent the death-results enhancement, he was facing a Sen-
tencing Guidelines range that might have been as low as 168
to 210 months' imprisonment, whereas with the enhance-
ment, he was looking at a mandatory life term. Although the
government argued that the Guidelines range actually would
have been 235 to 293 months, based on multiple sentencing
factors that it understood to be undisputed, Anderson
pointed out that his plea counsel had originally raised objec-
tions with respect to those factors and had withdrawn them
solely on the basis of the plea agreement. "Moreover, even if

Anderson faced a higher Guidelines range because of other factors, the maximum sentence still would have been short of the mandatory life sentence he faced with the death-results enhancement." *Id.* at 577.

We confronted and rejected the government's contention that even without the death-results enhancement, in view of Anderson's criminal history, he would have faced a statutory minimum sentence of 20 years under section 841(b)(1)(A), such that a guilty verdict at trial would have resulted in a sentence of at least 20 years and possibly up to life. We said that argument "misses the mark." *Id.* We explained that the relevant question as to this type of ineffectiveness claim is not whether Anderson would have done better at trial, but rather whether, had he been properly advised by counsel, he would have opted to go to trial rather than taking the plea. *Id.*

> Under the circumstances of this case, Anderson has adequately alleged a reasonable probability that he would have rejected the plea deal in favor of going to trial but for his attorney's deficiencies. Had he received effective assistance, Anderson would have had better insight into his likely sentence if convicted at trial. If the government could prove the basis for the death[-]results enhancement, Anderson would have faced a life sentence. Anderson's § 2255 petition, however, questions the government's ability to prove that basis. Without the enhancement, Anderson would have faced a sentence ranging from a statutory mandatory minimum of twenty years—the same sentence he agreed to in his plea—to a maximum of just over

twenty-four years (under the higher Guidelines range advocated by the government). Confronted with such similar sentencing consequences, and with the prospect of a life sentence off the table, Anderson may well have decided that he had little to lose and much to gain by playing the odds at trial rather than pleading guilty. While his prospects of an acquittal may have been slim, "the possibility of even a highly improbable result may be pertinent to the extent it would have affected his decisionmaking." Accordingly, we cannot conclude that it would be irrational for Anderson to reject a twenty-year plea offer in favor of forcing the government to prove its case at trial.

*Id.* at 577–78 (citation omitted).

Note two important points about the panel's prior opinion. First, the court assumed that without the death-results enhancement, Anderson would not have faced a mandatory life term. Presumably this was because the government did not make clear that there were other routes to a mandatory life term in this case even absent the death-results enhancement. Second, although the government did make clear that even without the death-results enhancement, there were grounds for subjecting Anderson to a 20-year mandatory minimum, which was the same sentence he received on his guilty plea, the court unequivocally rejected the notion that this defeated a finding that Anderson was prejudiced by his attorney's purported ineffectiveness. Rather, the court reasoned that even if Anderson would face the same or a somewhat longer sentence if he were convicted at trial, Anderson

could still show that he would have taken his chances and proceeded to trial rather than accepting the plea deal.

The case then proceeded to an evidentiary hearing on remand. Schneiderheinze testified that, under the circumstances, she thought the 20-year term called for by the plea agreement was the best possible deal her client could obtain. She represented that her client was aware of *Burrage* and the need to consult with an expert in order to assess whether the government would be able to prove, in compliance with *Burrage*, that the heroin distributed by Anderson was a but-for cause of Reader's death. Schneiderheinze believed that the defense otherwise had a good case on the death-results issue—indeed, she assumed that her client might have prevailed on a challenge to this enhancement had she and Anderson decided to pursue it—but the government would not drop it and would not agree to a term of 20 years unless Anderson acknowledged that his heroin distribution had resulted in Reader's death. She also understood that the government had other ways of triggering a mandatory minimum term of life, whether by showing that Anderson was responsible for inflicting serious bodily injuries on Heilman or Holmes and had one prior felony drug conviction, or by showing that Anderson had two prior felony drug convictions. In view of those alternatives, Schneiderheinze did not believe it was necessary to consult with an expert before advising her client to accept the plea deal and stipulate to responsibility for Reader's death, as Anderson would still be facing a prison term far worse than the agreed-upon 20-term without the death-results enhancement. She explained that she had not discussed these alternative pathways to a life term in the affidavit she filed previously at the district court's instruction, given that Anderson's ineffectiveness claim was

focused on the death-results enhancement and she did not believe her former client's waiver of attorney-client privilege extended beyond that enhancement, so she had limited her affidavit accordingly.

Dr. Steven Aks, an emergency-care physician and medical toxicologist, testified for Anderson that apart from the drugs tested for and detected in Reader's system, the evidence revealed that Reader had prescriptions for two other drugs that, if Reader ingested them on the day of his overdose, might have contributed to his death. Reader had a prescription for Clonazepam, a sedative medication which can depress breathing, but the coroner had not tested for that drug.[9] A police report indicated that Reader had taken three yellow pills—which could have been Clonazepam—on the day of his death, before he took the first dose of heroin; apart from that, it was unknown whether Reader took Clonazepam or any other medication later in the day. There were no pills found in Reader's digestive system, but he had vomited prior to his death and there was no evidence in the record as to the contents of the vomitus. Reader also had a prescription for Suboxone® to treat opioid abuse. Suboxone®, by preventing someone from experiencing a high, could cause the individual to inject more heroin. Again, the coroner had not tested for the presence of that drug in Reader's system. Dr. Aks could not rule out the possibility of heroin overdose as a cause of death, but his opinion was that Reader's death was the result of a

---

[9] The police report regarding Reader's death indicates that he had a prescription filled for 120 Clonazepam pills on August 23, 2012, two days before he died, but there were only 67 pills left in the bottle found at the scene of his death.

polydrug overdose, and the evidence was inconclusive as to which drug led to his death.

The government did not put on its own evidence on the death-results question. At least for purposes of this appeal, it appears to have implicitly conceded that in view of Dr. Aks' testimony, the prosecution likely would not prevail on the death-results issue if the case proceeded to trial.[10] Instead, the government's focus on remand was on the question of prejudice and specifically whether, absent the death-results enhancement, Anderson would have faced a statutorily-mandated term of life in prison in view of the serious bodily injuries suffered by Heilman and Holmes and his multiple prior felony drug convictions.

Regarding Anderson's criminal history, a question arose near the end of the hearing below whether Anderson's 2006 and 2009 Illinois convictions actually qualified as predicate felony drug offenses under section 802(44),[11] and the district court ordered briefing on that point. Recall that these were two of the three convictions the government cited in its

---

[10] We note that the district judge found Dr. Aks to be a "very good" witness who was "very balanced with his testimony." R. 52 at 241. The judge also noted, however, that apart from the missing Clonazepam pills, there was no evidence to affirmatively support the notion that Reader had taken any additional medications prior to his death.

[11] Section 802(44) provides: "The term 'felony drug offense' means an offense that is punishable for more than one year under any law of the United States or of a State or foreign country that prohibits or restricts conduct relating to narcotic drugs, marihuana, anabolic steroids, or depressant or stimulant substances." Elsewhere, this section defines "narcotic drug" to include various substances, including "[c]ocaine, its salts, optical and geometric isomers, and salts of isomers." § 802(17).

section 851 notices as the bases for a statutory enhancement to Anderson's sentencing range pursuant to section 841(b)(1)(A). In that briefing, the government conceded that the 2009 Lake County conviction for attempted possession of heroin was a misdemeanor and thus did not qualify as a prior felony drug offense. R. 55 at 2. Anderson also raised questions about the 2006 and 2013 convictions. The 2006 Lake County conviction was for possession of cocaine, but Illinois' definition of cocaine is broader than the federal definition, in that the state definition includes positional isomers whereas the federal definition does not. *Compare* 720 ILCS 570/206(b)(4) (effective in relevant part June 1, 2000) *with* 21 U.S.C. § 812, Schedule II(a)(4), and §§ 802(14) and (17). Thus, this court held in *United States v. Ruth*, 966 F.3d 642, 647–50 (7th Cir. 2020), that because the Illinois definition of cocaine is categorically broader than the federal definition, a 2006 conviction for cocaine cannot qualify as a felony drug offense that triggers section 841(b)(1)(A)'s sentencing enhancement. As for the 2013 Peoria conviction for possession of heroin, Anderson argued that that offense did not qualify as a "prior" conviction because he was convicted and sentenced in state court on that offense on March 25, 2013, but the conviction did not become final until the 30-day period in which to appeal expired on April 24, 2013. By that time, the heroin-conspiracy offense charged in this case had already come to an end, given that Anderson submitted himself to custody and began serving his sentence on the state conviction on April 9, 2013, and he had remained in custody continuously after that date. Finally, apart from these three convictions, the government pointed out that Anderson had the two other prior felony drug convictions from Cook County, Illinois that we mentioned earlier: one for possession of 30–500 grams of cannabis and the

second for the manufacture/delivery of 1–15 grams of cocaine. These were both noted in the PSR prepared for Anderson's sentencing in this case (and to which the defense did not raise an objection), but neither of them had been cited in the section 851 notices that the government had filed. For that reason, Anderson argued that the government could not rely on these sentences in arguing that Anderson faced a potential mandatory life sentence even without the death-results enhancement.

Given the various problems and questions regarding Anderson's prior drug convictions, Anderson now contended that Schneiderheinze was also ineffective for failing to properly investigate his criminal history to determine whether that history, alone or in combination with other factors, exposed Anderson to a potential life term, as the government had asserted and Schneiderheinze had assumed. R. 57 at 10–12.

After considering the evidence and briefing, the district court, without deciding whether Schneiderheinze was ineffective in advising Anderson to plead guilty and accept a 20-year term, concluded that Anderson was not prejudiced by any shortcomings in her lawyering and denied his section 2255 motion on that basis. R. 59. As the court saw it, Anderson faced two choices during the plea negotiations: (1) accept the plea offer, which turned a blind eye to his prior convictions, and lock in a 20-year sentence, or (2) challenge the death-results enhancement, surrender the certainty of the sentence proposed in the plea offer, and risk the possibility that his eventual sentence might be no better and possibly significantly worse. The decision to accept the plea deal amounted to a strategic choice. There was no guarantee that the

government would not have withdrawn the plea offer had Anderson challenged the death-results enhancement. If Anderson lost the death-results challenge, he would have faced a mandatory minimum prison term of 20 years; if he lost *and* he had one prior felony drug conviction, he faced a mandatory prison term of life. Even if he won on the death-results enhancement, he faced a 20-year minimum term if either of Heilman's or Holmes' overdoses were deemed to have resulted in serious bodily injury. And he still would have faced a mandatory life term in two other scenarios: (1) he had two prior felony drug convictions or (2) he had one prior felony drug conviction *and* his heroin trafficking had resulted in at least one instance of serious bodily injury. R. 59 at 8–9.

The district court agreed with Anderson that in order to accurately evaluate Anderson's sentencing exposure, his counsel would have had to undertake at least some inquiry into his prior convictions to determine whether they qualified as predicate felony drug convictions under section 802(44) sufficient to trigger enhanced statutory penalties. There was no evidence indicating whether or not Schneiderheinze, apart from looking at the criminal history documentation provided to her by the probation department and the prosecution and ascertaining whether her client had any concerns about the accuracy of those documents, undertook such an investigation. R. 59 at 10. In retrospect, it was clear that there were problems with at least one and possibly all three of the prior convictions that the government had cited in its section 851 notices as the trigger for enhanced statutory penalties: The government had now stipulated that the 2009 Lake County conviction was not a felony drug offense, and Anderson was raising questions as to whether the 2006 Lake County and 2013 Peoria County convictions themselves properly

qualified as prior felony drug convictions. In the district court's view, the question whether Schneiderheinze conducted, at the least, a "cursory investigation" into those three investigations "weigh[ed] heavily" on the reasonableness of her advice to Anderson that he forgo further inquiry into the death-results enhancement and lock in the 20-year sentence provided for in the plea agreement. R. 59 at 10. "Without prior predicate offenses, [Anderson] had at least a chance of avoiding a mandatory minimum sentence." R. 59 at 10. "However, given the lack of evidence on this point, the Court cannot conclusively determine whether counsel's performance was deficient." R. 59 at 11.

Instead, the court resolved the matter on the question of prejudice. Unless Anderson had agreed to the death-results finding as part of his guilty plea, his only other option was trial. There was, in Schneiderheinze's view, ample evidence to support a guilty verdict on the charge that Anderson had conspired to distribute at least one kilogram of heroin. R. 59 at 11–12. As for the statutory aggravating factors, even assuming that Anderson could conclusively demonstrate that his heroin distribution was not a but-for cause of Reader's death,[12] there remained other avenues to either a 20-year minimum term or a mandatory life sentence. R. 59 at 11. If Anderson were convicted, he faced, at the very least, a 20-year

---

[12] Of course, it was the government that would have borne the burden of proof on this point at trial. *Burrage*, 571 U.S. at 218–19, 134 S. Ct. at 892. But we take the district court's point that for purposes of establishing that he was prejudiced by his plea counsel's purported ineffectiveness, it was Anderson's burden to show that the government would have been unable to prove beyond a reasonable doubt that the heroin Anderson distributed was a but-for cause of Reader's death.

minimum term assuming, for example, that the 2006 Lake County conviction for cocaine possession qualified as a prior felony drug conviction. R. 59 at 11–12.

The court also rejected Anderson's effort to retroactively cast doubt on one of the two prior remaining felony convictions cited in the section 851 notices (the third conviction having now been identified as a misdemeanor). The court acknowledged that Anderson was arguing for the first time that his 2006 cocaine conviction did not qualify as a felony drug conviction because Illinois' definition of cocaine is categorically broader than the federal definition, and his plea counsel should have recognized as much. R. 59 at 12 (citing *Ruth*, 966 F.3d at 650). But the court was unwilling to recognize this argument for three reasons: (1) Anderson had not argued in his section 2255 motion that his counsel was ineffective for failing to investigate his prior criminal history and the government thus had not had a chance to respond on that point. (2) Anderson was arguing that his attorney in 2015 should have made a challenge to the 2006 conviction based on case law that was not decided until 2020, five years after his guilty plea. The court agreed it was theoretically possible for his counsel to have made such a challenge, but given there was no precedent in 2015 recognizing that Illinois defined cocaine more broadly than the federal government did, the court, citing *Harris v. United States*, 13 F.4th 623, 630–31 (7th Cir. 2021), found that it was reasonable for Anderson's counsel to accept the proverbial bird in the hand and to lock in a 20-year sentence rather than risk a mandatory life term. Finally, (3) Anderson's section 2255 motion only took into account the death-results enhancement, not the enhancement for serious bodily injury. But his plea agreement

acknowledged that the government could prove the factual bases for both enhancements. R. 59 at 12–14.

The court thus concluded that Anderson had not shown that he was prejudiced by any ineffectiveness on the part of his counsel when she advised him to enter into a plea agreement that capped his sentence at 20 years. The only other option available to Anderson was to go to trial, which would have exposed him to a sentence at least as long as, if not longer than, the 20-year term he had agreed to, and possibly to a mandatory life sentence. R. 59 at 13–14.

The court issued a certificate of appealability as to the prejudice issue. R. 59 at 15.

## II.

This case looks substantially different now than it did when it was last before us. As our procedural summary makes clear, the premise of Anderson's section 2255 claim as initially presented to the district court and to this court was that the death-results enhancement drove the life sentence that he was facing without the plea agreement, and that if that enhancement were taken off the table, then Anderson was facing a mandatory minimum term of 20 years, not life. That premise was the springboard for Anderson's claim that, had his counsel consulted with a medical expert and exposed the government's inability to carry its burden of proof as to the death-results enhancement, Anderson would have rejected the plea agreement and taken his chances at trial. Neither in the district court nor in this court did the government challenge the premise that the death-results enhancement was the sole basis for a mandatory term of life in prison. It was against that backdrop that we concluded in the prior appeal that

Anderson's theory of ineffectiveness was plausible and that an evidentiary hearing was required.

Only on remand did the government argue—consistent with the more fulsome explanation Schneiderheinze provided in her testimony as to her reasons for advising Anderson to accept the plea deal—that the death-results enhancement was only one of several bases on which Anderson potentially faced a mandatory minimum term of life. Thus, the government now argued, it was reasonable for his counsel to negotiate a plea requiring him to serve a term of 20 years without looking further into the viability of the death-results enhancement: even assuming the government's inability to establish the factual basis for that enhancement, Anderson was still facing a mandatory life term under either of two alternatives.

The government did not present this line of argument to us previously, although it appears to have realized that there was at least one alternative ground on which Anderson faced a mandatory life term: When it set forth the statutory scheme in its brief, the government did briefly acknowledge, in a footnote, that responsibility for a serious bodily injury plus one prior felony drug conviction would also trigger a mandatory term of life in prison. *See ante* at 16 n.8. It noted the same at oral argument in response to a question from a member of this court. Appeal No. 19-1257, Oral Arg. 10-29-2020 at 23:40–24:44. Yet, inexplicably, at no point did the government challenge the premise of Anderson's claim that the death-results enhancement was crucial to a life term and without it he would have faced, at worst, a minimum term of 20 years. Instead, the government pressed the theory that even in the face of a 20-year minimum, it was reasonable for Anderson's

counsel to negotiate the plea terms that she did without consulting a medical expert as to the cause of Reader's death and that Anderson could not show that he was prejudiced by any ineffectiveness on her part in doing so. That theory, of course, did not carry the day in the prior appeal.[13]

Nonetheless, we will entertain the government's belated argument as to prejudice. Schneiderheinze's testimony on remand makes plain that the alternative bases for a mandatory life term factored into her thinking as to the benefits the 20-year plea bargain would confer on her client. The government's counsel in turn raised these alternatives at the hearing on remand. Both parties had at least some ability to lay out their positions as to these alternatives at the hearing, and the district court in turn addressed them in its decision. At no point in the course of the remand did Anderson argue that the government had waived its belated invocation of alternative pathways to a life term as a basis for finding that he was not prejudiced. *See United States v. Buncich*, 20 F.4th 1167, 1172 (7th Cir. 2021) (although "[a]s a general rule, a party may not use the accident of a remand to make an argument that he could have raised—but did not—in his first appeal[,] [t]hat general rule does not hold true … when the opposing party fails to make a waiver argument in the district court and instead responds on the merits") (citations and internal quotation marks omitted); *United States v. Morgan*, 384 F.3d 439, 443 (7th Cir. 2004) ("[a] waiver argument … can be waived by the party it would help").

---

[13] To the extent the district court's opinion on remand relies in part on a similar rationale, it appears to have overlooked the reasoning in our prior opinion.

For the reasons discussed below, in view of the serious bodily injuries suffered by the two individuals who overdosed on heroin supplied by Anderson, we agree with the district court's bottom-line conclusion that he was not prejudiced by any ineffectiveness on the part of his plea counsel. Coupled with one prior felony drug conviction, those injuries would also have triggered a mandatory term of life in prison. § 841(b)(1)(A). Although, as it turns out, most of Anderson's prior drug convictions do not qualify as prior felony drug convictions under section 802(44) for purposes of the statutory penalty enhancement, including all three of the convictions that the government cited in its section 851 notices, there is one conviction in his criminal history that indisputably does so qualify. Therefore, there was a viable, alternative ground on which Anderson would have been subject to a life term. We have no reason to doubt, given the seriousness of the offense and Anderson's criminal history that the government would have pursued that alternative had Anderson not accepted the plea agreement.

We review the district court's decision to deny Anderson's request for relief pursuant to section 2255 de novo. *E.g.*, *Elion v. United States*, 76 F.4th 620, 626 (7th Cir. 2023).

Like any other criminal defendant, Anderson had a Sixth Amendment right to the effective assistance of counsel. *Lee*, 582 U.S. at 363, 137 S. Ct. at 1964. In order to obtain relief on his claim that his counsel was ineffective, Anderson must show both that his counsel's performance was deficient and that he was prejudiced as a result. *Strickland v. Washington*, 466 U.S 668, 687, 104 S. Ct. 2052, 2064 (1984). To establish deficient performance, he must show that his counsel's conduct "fell below an objective standard of reasonableness." *Id.* at 688, 104

S. Ct. at 2064. To establish prejudice, he must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S. Ct. at 2068.

"Judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. Our review must take account of the "wide range of reasonable professional assistance" that will comport with the Sixth Amendment's guarantee of the right to counsel. *Ibid.* "[C]ounsel's representation need not be perfect, indeed not even very good, to be constitutionally adequate." *Delatorre v. United States*, 847 F.3d 837, 845 (7th Cir. 2017) (internal quotation marks and citations omitted). We must evaluate the adequacy of counsel's performance from her perspective at the time she represented the petitioner, starting from a presumption that her representation was adequate. *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065.

The right to effective representation extends, of course, to the plea-negotiation process. *Lafler v. Cooper*, 566 U.S. 156, 162, 132 S. Ct. 1376, 1384 (2012) (collecting cases). A plea that is the product of ineffective assistance of counsel cannot be considered knowing or voluntary. *United States v. Harper*, 934 F.3d 524, 529 (7th Cir. 2019) (citing *Hurlow v. United States*, 726 F.3d 958, 967 (7th Cir. 2013)). To establish prejudice in the plea-bargaining context, Anderson must show that "the outcome of the plea process would have been different with competent advice." *Lafler*, 566 U.S. at 163, 132 S. Ct. at 1384 (citing *Missouri v. Frye*, 566 U.S. 134, 148, 132 S. Ct. 1399, 1410 (2012). One way for him to show this is to demonstrate that "but for counsel's errors, he would not have pleaded guilty and would

have insisted on going to trial." *Hill*, 474 U.S. at 59, 106 S. Ct. at 370; *see also Lafler*, 566 U.S. at 163, 132 S. Ct. at 1384–85.

As we noted in the prior appeal, "[i]n the plea bargaining context, reasonably competent counsel will attempt to learn all of the facts of the case, make an estimate of a likely sentence, and communicate the results of that analysis before allowing [her] client to plead guilty." *Anderson I*, 981 F.3d at 573 (citing *Gaylord v. United States*, 829 F.3d 500, 506 (7th Cir. 2016)); *see also Bridges v. United States*, 991 F.3d 793, 803 (7th Cir. 2021); *Brock-Miller v. United States*, *supra*, 887 F.3d at 308 (collecting cases). As in any case, an attorney must "make reasonable investigations or … make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066. "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.*, 104 S. Ct. at 2066. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91, 104 S. Ct. at 2066.

It is against this legal backdrop that we address Anderson's claim that his counsel was ineffective in negotiating the plea agreement and recommending that he accept it. The core premise of Anderson's claim is that Schneiderheinze could not properly advise him to accept the plea agreement without first consulting with a toxicology expert in order to evaluate the viability of the death-results enhancement. Dr. Aks' testimony makes sufficiently clear in hindsight that the government would not, in fact, have been able to prove beyond a reasonable doubt that the heroin Anderson distributed to

Reader via Mansini was a but-for cause of Reader's death—the government certainly makes no argument to the contrary. *See also* R. 59 at 10–11. Thus, Anderson reasons, had Schneiderheinze herself spoken with an expert, she would have realized the same thing, advised him accordingly, and, being properly counseled as to the shaky foundation for the death-results enhancement, he would have rejected the plea agreement and gone to trial.

Schneiderheinze, of course, justified her decision not to consult with a toxicologist by pointing out that because there were two other pathways to a life sentence for Anderson, it was reasonable for her not to delve further into the strength of the factual basis for the death-results enhancement. As Schneiderheinze recounts events, she and her client both appreciated the potential weaknesses of the government's case as to this enhancement, but she made a reasonable calculation, given that a life sentence would remain on the table even absent the death-results enhancement, that it was better to accept a plea for an agreed-upon term of 20 years rather than engaging a medical expert with the aim of opposing the government's insistence that Anderson was responsible for Reader's death and should so acknowledge in the plea agreement.

Of course, this rationale assumes the validity of the alternate grounds for a life sentence. Specifically, it assumes that Anderson had at least one qualifying prior felony drug conviction, which in combination with a serious bodily injury would trigger a life term, or that Anderson had two qualifying prior felony drug convictions, which in and of themselves would mandate a life term.

This is what led Anderson to argue on remand, as he does here, that Schneiderheinze was also ineffective for failing to investigate his criminal history. In retrospect, as we explain below, all three of the convictions that the government intended to rely on to trigger enhanced statutory penalties do not qualify as predicate felony drug convictions under section 802(44), and as Anderson sees things, Schneiderheinze would have come to this realization had she made a reasonable effort to evaluate these three convictions.

Before we proceed any further on this subject, we must deal with a threshold question. The district court posited that Anderson had waived any claim of ineffectiveness as to his criminal history because he did not raise such a claim in his habeas petition or in the initial round of litigation. The government makes the same assertion on appeal.

But, in the first instance, this rationale overlooks the government's own belated reliance on the alternate pathways to a life sentence, both of which depend on Anderson having either one or two qualifying predicate convictions.[14] Schneiderheinze in her own testimony cited these alternative pathways as the reason why she did not think it necessary to look further into the merits of the death-results enhancement. Anderson has the right to respond to the government's invocation

---

[14] The government adds that the certificate of appealability does not include a claim that Schneiderheinze was ineffective for failing to investigate Anderson's criminal history. Of course, we have the authority to expand the certificate, *see Stechnauer v. Smith*, 852 F.3d 708, 717–18 (7th Cir. 2018); *Welch v. Hepp*, 793 F.3d 734, 737–38 (7th Cir. 2015); *Rittenhouse v. Battles*, 263 F.3d 689, 693 (7th Cir. 2001), and we could do so here if it were necessary to resolve the appeal. We do not find it to be necessary in this case.

of these alternate pathways, and his response appropriately
includes an argument that his plea counsel could not have
reasonably relied on those alternatives without being confi-
dent that they were viable, which in turn presumes that his
criminal history would support one or both of the alterna-
tives. Properly understood, Anderson's argument that
Schneiderheinze was ineffective in this respect is not a sepa-
rate claim but one intertwined with his contention that his
counsel's advice to accept the plea deal and stipulate to hav-
ing caused Reader's death without first consulting with a
medical expert amounted to ineffective assistance. As the dis-
trict court itself recognized, "Under the circumstances of this
case a cursory investigation into, at a minimum, the three …
convictions that were identified in the § 851 information filed
by the government weighs heavily on the reasonableness of
Petitioner's attorney's advice to forgo an investigation into
the applicability of the death enhancement and secure the
guaranteed 20-year sentence offered by the [plea] agree-
ment." R. 59 at 10.

Second, the duty to confirm that each of the prior convic-
tions cited in the section 851 notices qualified as a valid pred-
icate did not belong to Schneiderheinze alone. These were the
convictions that the government itself had selected from An-
derson's criminal history as the bases for a statutory enhance-
ment to his prospective sentence. As officers of the court,
counsel for Anderson and the government both had an obli-
gation to confirm that these convictions qualified as predicate
felony drug convictions for sentencing purposes. Yet the rec-
ord rather strongly suggests that even as the evidentiary hear-
ing opened in March 2022, more than eight years after the first
section 851 notice was filed and six years after Anderson was
sentenced, neither Schneiderheinze nor the government's

counsel had any idea that there were potential problems with these convictions: When the government cross-examined Schneiderheinze during the hearing, it walked her through each of the three convictions cited in its section 851 notices and elicited her agreement that each qualified as a valid predicate felony drug offense. *See* R. 52 at 172–75. Only in the post-hearing briefing, as we have noted, did the government's counsel acknowledge that there was a problem with at least one of these convictions. Of course, we recognize that the overlooked flaws may be actionable only by way of an ineffectiveness claim that would assign the blame to Anderson's counsel for not detecting the problems before he pled guilty. Our point, however, is that there is blame to be shared for the eleventh hour at which these flaws have been noticed and addressed. And under all of the circumstances of this case, we do not believe that Anderson should be precluded from raising them.

Third, even if we were inclined to deem Anderson foreclosed from pursuing a claim of ineffectiveness with respect to his criminal history, any shortcomings in his prior drug convictions as predicates for enhanced statutory penalties would remain relevant as to any prejudice he suffered vis-à-vis his counsel's alleged ineffectiveness as to the death-results enhancement. The district court itself resolved Anderson's claim with respect to the death-results enhancement on the question of prejudice, and the government urges us to do the same. We will likewise focus on the prejudice component of Anderson's case and consider the various problems with his prior drug convictions in that context.

Where, as here, the government relies on one or more of a defendant's prior convictions to trigger an enhanced statutory

penalty, section 851 requires that it file an information (what we refer to as a "notice") identifying the relevant conviction or convictions. The two separate notices that the government filed (eight months apart) in this case both cited the same three Illinois convictions: the 2006 conviction for possession of cocaine; the 2009 conviction for attempted possession of heroin; and the 2013 conviction for unlawful possession of heroin.

The 2009 Lake County conviction for attempted possession of heroin[15] turns out to have been a conviction for a misdemeanor offense with a maximum penalty of a year or less in prison, as the parties now agree. It therefore does not qualify as a predicate felony drug conviction. *See* § 802(44) ("felony drug offense" means, *inter alia*, "an offense that is punishable by imprisonment for more than one year"); *Burgess v. United States*, 553 U.S. 124, 129–30, 128 S. Ct. 1572, 1577 (2008); *United States v. Elder*, 840 F.3d 455, 461–62 (7th Cir. 2016).

The 2013 Peoria County conviction for possession of heroin was not yet final[16] on April 9, 2013, when Anderson's active participation in the charged federal conspiracy ended with his incarceration on the state offense; although the circuit court had entered judgment on his conviction on March 25, 2013, the 30-day window for him to take a direct appeal of the

---

[15] The PSR noted and the district court acknowledged that this conviction was for attempted heroin possession that constituted relevant conduct vis-à-vis the federal offense. *See* U.S.S.G. § 1B1.3. R. 111 at 15, 30 (Revised PSR ¶¶ 65, 157); R. 126 at 23.

[16] Section 841(b)(1)(B) makes clear that the triggering event for a recidivist enhancement is the defendant's commission of a controlled-substance offense "after a prior offense for a felony drug offense has become final[.]"

conviction had not yet run, and so the conviction does not qualify as a final, "prior" conviction vis-á-vis the federal offense. Although we have not previously addressed this particular issue, at least nine other circuits have so held in a line of authority originating more than 40 years ago. *See United States v. Lovell*, 16 F.3d 494, 497 (2d Cir. 1994); *United States v. Allen*, 566 F.2d 1193, 1195 (3d Cir. 1977); *United States v. Campbell*, 980 F.2d 245, 251 n.9 (4th Cir. 1992); *United States v. Morales*, 854 F.2d 65, 69 (5th Cir. 1988); *United States v. Walker*, 160 F.3d 1078, 1093 (6th Cir. 1998); *United States v. Maxon*, 339 F.3d 656, 659 (8th Cir. 2003); *Williams v. United States*, 651 F.2d 648, 650–51 (9th Cir. 1981); *United States v. Short*, 947 F.2d 1445, 1460 (10th Cir. 1991); *United States v. Lippner*, 676 F.2d 456, 467 (11th Cir. 1982). This well-established line of authority would have been readily discoverable to an attorney looking into the finality question. The government has cited no contrary authority, [17] nor has it given us any reason to depart from the holdings of our sister circuits, and we now follow those decisions in holding that Anderson's 2013 conviction was not yet final and therefore was not a "prior" conviction for sentencing purposes in this case.

This brings us to the 2006 Lake County conviction for cocaine possession. Under the law of this circuit as it exists today, that conviction of course would not qualify as a predicate felony drug conviction given *Ruth*'s holding as to the

---

[17] Our decision in *United States v. Garcia*, 32 F.3d 1017, 1018–20 (7th Cir. 1994), on which the government relies, is not to the contrary. *Garcia* deals with the factual overlap between a federal conspiracy offense of conviction and a prior state narcotics conviction rather than the finality of the prior conviction. Nothing that the decision says in that regard is inconsistent with the finality principle that other circuits have adopted.

categorical mismatch between the Illinois and federal defini-
tions of "cocaine." 966 F.3d at 647–50. Because we are focusing
on prejudice rather than ineffectiveness, we can set aside the
question whether Schneiderheinze should have considered
making a *Ruth*-type challenge to the 2006 conviction. But even
for the limited purpose of assessing prejudice, it bears men-
tion that our recent decision in *Coleman v. United States*, 79
F.4th 822 (7th Cir. 2023), concludes that the precedential tools
were in place in 2015 for a *Ruth*-type challenge to be made to
this type of conviction. We held in *Coleman*—over a dissent—
that it would have been unreasonable in 2014 for a defend-
ant's attorney not to have even considered a categorical chal-
lenge to the government's reliance on his prior Illinois cocaine
convictions to enhance his sentence, particularly where the
enhancement would have resulted in a life term. *Id.* at 832. We
noted:

> [T]he groundwork for such an argument was, at
> the very least, foreshadowed by numerous de-
> cisions issued before 2014 (the year Coleman
> was sentenced) that applied the categorical ap-
> proach to predicate offenses in other contexts.
> These cases demonstrate that, although the cat-
> egorical approach had not yet been applied to
> prior convictions like Coleman's by 2014, the
> framework for making such a challenge had
> been established.

*Id.* at 831–32 (citations omitted). We can therefore assume that
had a categorical challenge been made to the government's
reliance on a prior Illinois cocaine conviction in 2015, it ulti-
mately would have been successful in eliminating the last of
the three prior drug convictions that the government had

cited as the basis for statutory enhancements to Anderson's sentence. *See id.* at 833 & n.10.

Of course, there were two other prior felony drug convictions in Anderson's criminal history—the two Cook County convictions in the year 2000, one for the manufacture/delivery of 1–15 grams of cocaine and the other for possession of 30–500 grams of cannabis. Although the government had not cited either of these convictions in its two section 851 notices, it was free to file an amended notice at any time prior to the entry of Anderson's guilty plea. *See* § 851(a)(1). Filing an amended section 851 notice is neither unprecedented nor unusual, and we have no reason to doubt that had Anderson's counsel challenged the sufficiency of the convictions cited in its prior notices, the government would have identified the additional convictions in Anderson's criminal history and filed an amended notice incorporating those convictions. We can therefore consider whether either or both of these prior convictions would have constituted valid predicates under section 802(44) for purposes of enhancing Anderson's statutory sentencing range.

The conviction for the manufacture and/or delivery of 1-15 grams of cocaine obviously runs into the same *Ruth* categorical mismatch problem that the 2006 Lake County conviction for cocaine possession does. So it would not have supported a statutory sentence enhancement.

The conviction for possession of 30–500 grams of cannabis, however, is another matter. It does not present a *Ruth* mismatch problem, it was a felony conviction, and the conviction was final long before Anderson's participation in the heroin trafficking at issue in this case concluded. The conviction does qualify as a valid predicate under section 802(44) and would

support a statutory sentence enhancement under section 841(b)(1)(A).[18]

With just a single conviction in Anderson's criminal history qualifying as a valid prior felony drug conviction, however, it is apparent that one of the two alternative pathways to a mandatory life term—having previously been convicted of *two* such felony drug convictions—was closed. The remaining ground for a life term would have been that Anderson distributed heroin resulting in serious bodily injury and that he had one prior felony drug conviction. § 841(b)(1)(A).

Anderson, of course, stipulated in pleading guilty that he was responsible for serious bodily injuries to both Heilman and Holmes, and in contrast with his stipulation to having caused Reader's death, we have no reason to question the validity of that stipulation. Recall that these two individuals overdosed (in Heilman's case, twice) on heroin that was purportedly supplied by Anderson and required resuscitation. Those overdoses do not present the same causation issues that Reader's death presents. It is possible that Holmes' overdose might present a source question in that the heroin was obtained via Mansini, and the record reflects that Anderson was Mansini's "primary" (not exclusive) supplier of heroin at that particular time. R. 111 at 7 (Revised PSR ¶ 30). But there is no such question presented as to Heilman's second overdose,

---

[18] Illinois has since decriminalized the simple possession of up to 30 grams of marijuana by Illinois residents. *See* 410 ILCS 705/10-10(a)(1). But that is irrelevant for purposes of section 841. *See United States v. Sanders*, 909 F.3d 895, 899–904 (7th Cir. 2018) (subsequent re-classification of prior state felony drug conviction to a misdemeanor offense does not preclude application of section 841 recidivist enhancement).

which occurred after she ingested heroin she had obtained directly from Anderson. R. 111 at 6 (Revised PSR ¶¶ 28–29).

The principal point that Anderson has raised with respect to the serious-bodily-injury enhancement is that there existed little case law in 2015 speaking to the question whether an overdose from which one has recovered qualifies as a serious bodily injury. It is true enough that most of the cases addressing this question (and which answer it in the affirmative) post-date Anderson's guilty plea. *See*, *e.g.*, *United States v. Cooper*, 990 F.3d 576, 582–83 (8th Cir. 2021); *United States v. Seay*, 2023 WL 171148, at *5 (S.D. Ohio Jan. 12, 2023); *United States v. Coles*, 2022 WL 17405830, at *12–*13 (M.D. Pa. Dec. 2, 2022); *United States v. Piaquadio*, 2019 WL 3337063, at *5 (M.D. Pa. July 25, 2019); *Cockrell v. United States*, 2016 WL 11190470, at *6–*7 (E.D. Tex. Oct. 18, 2016), *report & recommendation adopted*, 2017 WL 1088339 (E.D. Tex. Mar. 22, 2017), *j. aff'd*, 769 F. App'x 116 (5th Cir. 2019) (non-precedential decision).[19] But the statute itself defines "serious bodily injury" as a bodily injury which, inter alia, involves "a substantial risk of death." 21 U.S.C. § 802(25)(A).[20] It is hard to imagine why the overdoses that Heilman and Holmes experienced would *not* meet

---

[19] Schneiderheinze cited the lack of substantial pre-plea precedent on this point as a reason why she testified in her deposition that she did not take the prospect of the serious bodily injury enhancement seriously. R. 59 at 150–52.

[20] The statute does not define "bodily injury," but that term is frequently understood to include the impairment of bodily and mental functions. *See United States v. Breshers*, 684 F.3d 699, 702–03 (7th Cir. 2012) (citing, *inter alia*, 18 U.S.C. § 1365(h)(4)(D)); *United States v. Myers*, 972 F.2d 1566, 1572–73 (11th Cir. 1992) (citing multiple other federal statutes).

that definition, when each necessitated the administration of either CPR or Narcan®.

The district court found little reason to believe that the jury would have acquitted Anderson on the charge that he conspired to distribute in excess of one kilogram of heroin, and we likewise have no reason to believe that the jury would have acquitted him of distributing heroin that resulted in serious bodily injury. Two people who ingested heroin supplied by Anderson overdosed on three occasions, requiring active intervention with CPR or Narcan® to revive them. This meets the statutory definition of "serious bodily injury," and we have no reason to doubt that a jury would have so found.

Thus, even assuming that Anderson's plea counsel was ineffective in one or more respects in advising him to enter into the plea agreement, we agree with the district court's conclusion that he was not prejudiced. A guilty finding on the serious bodily injury enhancement, coupled with his 2000 conviction for possessing 30–500 grams of cannabis, would have triggered a mandatory term of life in prison. By comparison, the 20-year term specified by the plea agreement was much less onerous.

This is not to say that there were not serious omissions by attorneys on both sides of this prosecution. In negotiating the plea agreement, both prosecution and defense counsel operated on the assumption that there were three viable pathways to a mandatory life term. But serious questions as to Anderson's criminal history, which was a gateway to all three of these paths, were overlooked. Although the categorical mismatch problem with two of Anderson's prior drug convictions are much more clear in retrospect than they would have been at the time of the plea, the fact that one prior conviction

was for a misdemeanor and the other was not yet final when
Anderson was taken into custody and his participation in the
charged federal conspiracy came to an end would have been
readily discernible had counsel made modest efforts to in-
quire beyond the face of the convictions. A defendant has a
right, and the court has a right, to expect that counsel for both
parties will have taken the steps necessary to confirm that his
prior convictions meet the statutory criteria to qualify as prior
felony drug convictions, especially when those convictions
are cited as the basis for enhanced statutory minimum and
maximum prison terms. We should not have to be sorting out
such issues years after the defendant has been convicted and
sentenced.

We are also more than a little dismayed that the govern-
ment did not rely on the alternative pathways to a life term in
the prior appeal when it argued that Anderson was not prej-
udiced by any ineffectiveness on the part of his plea counsel.
The issue of prejudice was obviously ripe for consideration at
that time, and the government made other arguments as to
prejudice. The alternative grounds for a life sentence were ob-
viously within the knowledge and contemplation of the gov-
ernment as the plaintiff in this prosecution. Had this line of
argument been raised at that time, we might not have found
it necessary to remand this case for an evidentiary hearing on
the death-results enhancement.

## III.

For all of the reasons we have discussed, Anderson was
not prejudiced by any ineffectiveness on the part of his plea
counsel. He is therefore not entitled to relief on his claim of
attorney ineffectiveness. We AFFIRM the district court's judg-
ment.